**UNITED STATES of America, Plaintiff,**

v.

**Joshua PERRY, Defendant.**

**C.R. No. 04–089S.**

United States District Court, D. Rhode Island.

Sept. 16, 2005.

Kevin J. Fitzgerald, Federal Defender's Office, Providence, RI, for Plaintiff.

Stephen G. Dambruch, U.S. Attorney's Office, Providence, RI, for Defendant.

### Sentencing Memorandum

SMITH, District Judge.

## I. Introduction

Before the Court for sentencing is Joshua Perry ("Defendant" or "Perry"), who was convicted in January of 2005 of possession with intent to distribute more than 5 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and b(1)(B), as well as doing so within 1000 feet of a school in violation of 21 U.S.C. § 860. Title 21 U.S.C. § 841(a) prohibits, among other things, possession with the intent to distribute a controlled substance. The statute provides for different mandatory minimum sentences depending on whether the substance is "cocaine" (including "its salts") or "cocaine base."[1] Under this stat-

---

1. 21 U.S.C. § 841 is not a model of clarity. The statute provides, in relevant part:

(a) Unlawful acts
... it shall be unlawful for any person knowingly or intentionally—
(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance....

(b) Penalties
...
(1) ...
(B) In the case of a violation of subsection (a) of this section involving—
...
(ii) 500 grams or more of a mixture or substance containing a detectable amount of—

utory scheme, 5 grams of cocaine base carries the same mandatory minimum sentence as 500 grams of cocaine: 5 years. This 100:1 ratio results in punishments that are three to six times longer for cocaine base than for an equivalent quantity of powder cocaine. This discrepancy is at the core of all of the issues involved in this sentencing.

The first issue raised by the Defendant concerns whether the statutory definition of "cocaine base" in § 841 should be interpreted to mean exclusively "crack" cocaine, which is a type of cocaine base, or whether it should include all types of cocaine base. If cocaine base is understood to mean exclusively crack, then, in order for the Government to seek the stiffer penalty under the statute, it must prove that a defendant possessed crack (as opposed to some other form of cocaine base) to a jury, and its proof must convince the jury beyond a reasonable doubt. The Defendant argues that cocaine base means exclusively crack under the statute; and because the jury did not specifically make such a finding in

this case, he should be sentenced under the provisions of the statute and the United States Sentencing Commission Guidelines Manual ("Sentencing Guidelines" or "Guidelines") that apply to powder cocaine. For the reasons set forth below, this Court declines to adopt Defendant's interpretation of the statute.

Since 1993 the Guidelines have provided that cocaine base means exclusively crack; therefore, the sentencing judge (not a jury) must determine whether the Government has proven that the cocaine base in question was indeed crack. The Defendant's second argument is that this proof must be beyond a reasonable doubt, and the Government failed to meet this burden; in the alternative, the Defendant claims that even if the court finds a lower standard of proof applies, the proof presented by the Government did not establish the cocaine base to be crack by a preponderance of the evidence. Again, as will be explained in more detail below, the Court finds neither of the Defendant's arguments persuasive.

---

(II) *cocaine, its salts*, optical and geometric isomers, and salts of isomers;

. . .

(iii) 5 grams or more of a mixture or substance described in clause (ii) which contains *cocaine base;*

. . .

such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years . . . .

21 U.S.C. § 841 (1999) (emphasis added). For starters, cocaine, scientifically speaking, is itself a "base"; cocaine, therefore, technically *is* "cocaine base." *See United States v. Booker*, 70 F.3d 488, 490 (7th Cir.1995) ("Because cocaine is a base, the phrase 'cocaine base,' in scientific terms, is redundant."). Cocaine salt, moreover, refers to cocaine hydrochloride, also known as powder cocaine, which is derived from and chemically distinct from cocaine/cocaine base. *Id.* at 491. Despite all of this, the statute sets one penalty for substances containing "cocaine [and] its

salts," and another for those containing "cocaine base." It may be that by "cocaine [and] its salts," Congress really meant powder cocaine, as distinct from cocaine base. On the other hand, Congress may have intended "cocaine [and] its salts" to mean powder cocaine *and* cocaine base, as distinct from a unique form of cocaine base, known colloquially as "crack" cocaine. While the First Circuit has impliedly accepted the former interpretation of the statute by finding that cocaine base means more than just crack, it has not directly addressed the lack of clarity in the statute surrounding the use of the words cocaine and cocaine base. This Court need not resolve this question either, since resolution of this issue is not necessary to decide the Defendant's objections. For purposes of this Memorandum, this Court notes only that cocaine base under the statute most certainly includes crack cocaine (and may include more, as will be discussed shortly), but most certainly does not include powder cocaine.

In addition to these challenges, the Defendant objects to the inclusion of $1100 as drug proceeds in the calculation of the advisory guideline range and makes several double jeopardy arguments. Most of these objections are unavailing to the Defendant. One of the Defendant's arguments, however, does require the technical dismissal of Count I, because Count I is a lesser included offense of Count II.

After determining that the Government met its burden on the crack issue, two more questions follow: how much weight to give the sentencing range established by the Sentencing Guidelines, which are no longer mandatory in the wake of the United States Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) ("*Booker/Fanfan* "), and whether to impose a sentence consistent with or varying from the advisory Guideline range. The Defendant urges this Court to vary from the Sentencing Guidelines and impose only the statutory minimum sentence. Resolution of this issue requires this Court to delve into the thicket of the debate over the sentencing discrepancies between crack and powder cocaine—a debate that has simmered for many years but has been refueled recently by the *Booker/Fanfan* decision. For the reasons set forth in the second half of this memorandum, this Court finds that the crack/powder disparity cannot stand up to the scrutiny of analysis under 18 U.S.C. § 3553. Therefore, this Court will vary from the advisory sentencing range established by the Sentencing Guidelines and impose the statutory minimum sentence of 10 years.

## II. *Facts and Procedural History*

Pawtucket Police Detective Dennis Lefevbre arrested the Defendant on Rte. 95 North, in the city of Pawtucket, Rhode Island, on August 3, 2004, for driving an unregistered motor vehicle. Prior to the arrest, Lefevbre had obtained a search warrant to search the Defendant's premises located at 52 Lyon Street, Pawtucket. Officers seized marijuana, plastic bags containing suspected crack cocaine, a digital scale, packaging materials and $1100 in United States currency (believed to be drug proceeds) from the Defendant's bedroom. Police later determined that the Defendant's bedroom was located within 1000 feet of St. Raphael's Academy, a private secondary school in Pawtucket. Perry filed a Motion to Suppress Evidence which was denied by the Court, and the case proceeded to trial in January, 2005.

On January 12, 2005, after a week-long trial, a jury found the Defendant guilty of possession with intent to distribute more than 5 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and b(1)(B) (Count I) and within one thousand feet of a school in violation of 21 U.S.C. § 860 (Count II).[2]

The trial was conducted in the wake of the Supreme Court's decision in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and just prior to the Supreme Court's decision in *Booker/Fanfan,* a time when all trial courts were improvising in order to deal with the

---

**2.** 21 U.S.C § 860(a) provides, in relevant part:

[a]ny person who violates section 841(a)(1) ... of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or public or private college, junior college, or university ... is ... subject to (1) twice the maximum punishment authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense. A fine up to twice that authorized by section 841(b) of this title may be imposed in addition to any term of imprisonment authorized by this subsection.

holding of *Blakely*. Pursuant to the procedure adopted by this Court after *Blakely*, the case was to be submitted to the jury in two parts. First, at the completion of trial, the jury was asked to determine whether the Defendant was guilty of the two counts charged in the indictment. If the Defendant was found guilty, then this Court was prepared to submit a number of specific questions to the jury designed to elicit its findings, beyond a reasonable doubt, as to a number of anticipated sentencing factors. These special interrogatories were prepared after extensive pretrial consultation with counsel. Further, the Court was prepared to allow additional testimony, if necessary, and separate jury instructions had been prepared.)[3] In the event of a finding of guilt on either of the two counts, one of the specific questions for the jury was whether the cocaine base possessed by the Defendant was cocaine base in the form of crack cocaine. *See* U.S. Sentencing Guidelines Manual § 2D1.1(c) (2004).

While the jury was deliberating, and just shortly before it reached a verdict, the Supreme Court issued the *Booker/Fanfan* decision. After the jury reached its verdict of guilty, the Court consulted with counsel and then decided to recess overnight, to give both counsel and the Court time to review the *Booker/Fanfan* opinion and consider whether the special interrogatories concerning the sentence enhancement factors should be submitted to the jury. The following day, January 13, the Court met with counsel in chambers. Both counsel agreed with the Court that *Booker/Fanfan* precluded submission of special interrogatories to the jury, and the jury was discharged. Therefore, the jury

never answered the specific question of whether the cocaine base was crack.

In the usual course, the United States Office of Probation ("Probation") prepared a Presentence Report ("PSR"). The PSR sets forth a combined offense level of 34 and a criminal history category of III, yielding a Guideline range of 188 to 235 months. As a result of the Information Charging Prior Offenses, pursuant to 21 U.S.C. § 851, the Defendant was subject to an enhanced statutory penalty due to a prior felony drug conviction. Under this statute, the Defendant is potentially subject to a 10–year statutory minimum term of incarceration with a maximum term of life imprisonment as to both counts of the indictment. Thus, according to the PSR, the lowest possible sentence is the mandatory minimum of 10 years, while the maximum statutory penalty is life imprisonment. The (now advisory) Guideline range calls for a sentence between 188 and 235 months.

### III. *Defendant's Objections*

The Defendant filed two objections to the PSR, and raises several other arguments in his Supplemental Brief. First, the Defendant objects to the designation of the drugs as crack, contending that this question was never posed to the jury and has not been found beyond a reasonable doubt. Alternatively, assuming that a lower standard of proof, preponderance of the evidence, applies here, the Defendant contends that the evidence is nevertheless insufficient. Second, the Defendant objects to the inclusion of the $1100 found in the Defendant's residence as drug proceeds and conversion of the same into cocaine base for purposes of determining the base offense level. Finally, in his most

---

**3.** Essentially this Court had structured a two-phase trial along the lines of what Justice Stevens described in his dissenting Remedial Opinion in *Booker/Fanfan*. 543 U.S. 220, 125 S.Ct. at 779–80, 160 L.Ed.2d 621.

recent filing, the Defendant makes several arguments under the Double Jeopardy Clause of the Fifth Amendment. This Court will deal with the latter two objections first, and then move on to the more extensive discussion required by the first.

## A. The Drug Proceeds Objection

■ The Defendant's second objection can be dealt with in short order. The evidence at trial clearly proved by a preponderance of the evidence that the bedroom in which the $1100 was found was indeed Perry's bedroom, not that of a mysterious roommate, as Perry claimed. Moreover, at the time of his arrest, Perry was not employed. While he was subsequently approved for a claim of social security benefits on September 14, 2004, the Defendant was already in custody at that time and had not received any Social Security checks.

Defendant could provide no other reasonable explanation to Probation regarding the source of this money and he did not attempt to present evidence at the sentencing hearing to rebut this finding. Therefore, the $1100 found in the Defendant's bedroom was properly found to be drug proceeds. The street value of 1 gram of cocaine base at the time of the Defendant's arrest was $100; an additional 11 grams ($1100 ÷ 100) was appropriately added to the 49.47 grams that was seized at the time of the arrest, making the total 60.47 grams of cocaine base. The calculations in the PSR are entirely consistent with the formula approved by the First Circuit in *United States v. Gerante,* 891 F.2d 364 (1st Cir.1989); *see also United States v. Jackson,* 3 F.3d 506, 511 (1st

Cir.1993). Accordingly, Perry's drug proceeds objection is denied.

## B. The Double Jeopardy Argument

The Defendant's Supplemental Brief expands his objection to include three additional arguments under the Double Jeopardy Clause of the Fifth Amendment. The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The First Circuit has noted that:

> [t]he protection of the Clause is threefold; it safeguards an individual against (1) a second prosecution for the same offense, following an acquittal; (2) a second prosecution for the same offense, following a conviction; and (3) multiple punishments for the same offense.

*United States v. Rivera–Martinez,* 931 F.2d 148, 152 (1st Cir.1991).

■ The Defendant first argues that his conviction under both § 841(a)(1) (Count I) and § 860(a) (Count II) constitutes multiple punishment for the same offense in violation of the Double Jeopardy Clause, because § 841(a)(1) is a lesser included offense of § 860(a).[4] This Court agrees. The Supreme Court has long held that "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). If so, the offenses are not the same for purposes of double jeopardy. Conversely, where one offense is a lesser included offense of the other, i.e., where "the elements of the lesser offense are a subset of the elements of" the greater offense, *Schmuck v. United*

4. The Government apparently has no objection, as it filed no reply to the Defendant's Supplemental Brief raising this issue. *Cf. United States v. Williams,* 782 F.Supp. 7, 8

(D.D.C.1992) (noting that the government conceded that the defendants' convictions under § 841 "must be vacated" in light of convictions under § 860).

*States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the two counts constitute the "same offense" in violation of the Double Jeopardy Clause. *See Rutledge v. United States,* 517 U.S. 292, 297, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) ("we have often concluded that two different statutes define the 'same offense,' typically because one is a lesser included offense of the other").

█ Section 841(a)(1) makes it unlawful for any person to knowingly possess with the intent to distribute a controlled substance. Section 860(a), meanwhile, makes it unlawful for any person to knowingly possess with the intent to distribute a controlled substance *within 1000 feet of a school.* Violation of the former statute is clearly a lesser included offense of the latter, as made clear by those circuit courts that have directly addressed this issue. *United States v. White,* 240 F.3d 127, 133 (2d Cir.2001); *accord. United States v. Kakatin,* 214 F.3d 1049, 1051 (9th Cir.2000); *United States v. Freyre–Lazaro,* 3 F.3d 1496, 1507 (11th Cir.1993); *United States v. Scott,* 987 F.2d 261, 266 (5th Cir.1993). "While the government may charge a defendant with both a great-

er and a lesser included offense and may prosecute those offenses at a single trial, the court may not enter separate convictions or impose cumulative punishments for both offenses unless the legislature has authorized such punishment." *Freyre–Lazaro,* 3 F.3d at 1507 (internal citation omitted). There is nothing to suggest that Congress intended to do so here. *Id.* ("We believe that Congress intended to apply § 860 in lieu of § 841(b) when the offense occurs within 1,000 feet of a school."). The conviction of the Defendant is therefore vacated [5] as to Count I of the indictment, charging him with possession with intent to distribute more than 5 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1).[6]

█ The Defendant next argues that this Court's determination of whether the controlled substance is crack for sentencing purposes also violates the Double Jeopardy Clause, because it results in the Defendant being twice prosecuted—once under the statute for possession of cocaine base, and again under the Guidelines for possession of crack. This argument is unavailing. There simply is no second prosecution here. The Defendant was

---

**5.** The double jeopardy violation arising out of the Defendant's conviction under both § 841(a)(1) and § 860(a) cannot be remedied by merely refusing to sentence the Defendant under Count I, or having the sentences run concurrently. As the Supreme Court noted:

> [t]he second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate *conviction,* apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may ... result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal

> conviction.... Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.

*Rutledge,* 517 U.S. at 302, 116 S.Ct. 1241 (quoting *Ball v. United States,* 470 U.S. 856, 864–65, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985) (emphasis in original)); *see also United States v. Vanlandingham,* No. 95–122, CIV. A. 97–1738, 1997 WL 431010, at *5 (E.D.Pa. 1997).

**6.** Because the issues impacting the Defendant's sentence arise almost exclusively under § 841, and because § 860 essentially enhances the punishments outlined in § 841, this Court will, for the sake of simplicity, discuss these issues in the context of § 841, notwithstanding the fact that the Defendant's conviction under this lesser included offense is vacated.

prosecuted and convicted of possession with intent to distribute cocaine base. What remains is not a second trial of the Defendant for the same offense, but rather the second phase of the Defendant's only trial: sentencing. This case is therefore easily distinguishable from *United States v. Lanoue*, 137 F.3d 656, 660–61 (1st Cir. 1998) and *United States v. Fornia–Castillo*, 408 F.3d 52, 57–58 (1st Cir.2005), the two cases cited by the Defendant in support of his double jeopardy claim, both of which involved a second grand jury, a second indictment, and a second conviction. Moreover, in both cases, the First Circuit rejected the respective defendants' double jeopardy claims. *See Lanoue*, 137 F.3d at 663; *Fornia–Castillo*, 408 F.3d at 70.

In addition, this Court's determination that the controlled substance is crack does not result in multiple punishment for the same offense. This argument confuses the relationship between the statute and the Guidelines. "The Sentencing Guidelines are not a separate statutory provision of penalties," but rather are "intended to provide a narrow sentence range within the range authorized by the statute for the offense of conviction." *United States v. Sanchez–Lopez*, 879 F.2d 541, 559 (9th Cir. 1989). "This narrowing of the applicable range, however, does not constitute 'multiple punishment' for purposes of the double jeopardy clause." *United States v. Alvarez*, 914 F.2d 915, 920 (7th Cir.1990). Here, the Guidelines provide for a sentencing range of 185 to 235 months based on a finding that the Defendant possessed crack, while the statute provides for a maximum of life imprisonment. The Defendant's sentence is necessarily within the statutory range sanctioned by Congress, and therefore does not violate the Double Jeopardy Clause. "Calculation under the Federal Sentencing Guidelines of the proper sentence within the statutory range established by Congress ... does

not constitute multiple punishment," but rather comprises "only a single substantial punishment" for a controlled substance offense. *Id.* at 920 (internal citation omitted).

Most importantly, the Defendant's double jeopardy claim concerning this Court's determination of crack rests upon the assumption that this Court is bound by the Guidelines to enhance the Defendant's sentence should it find that the Defendant possessed crack. This is not the case. In the wake of *Booker/Fanfan*, the Guidelines are advisory and to be considered alongside the other § 3553(a) factors. The Double Jeopardy Clause is concerned with a single act or transaction "constitut[ing] a violation of two distinct statutory provisions." *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180. Here, because no enhancement need be imposed by the Court under the advisory Guidelines, even if a finding of crack is made, there is no second "violation" from which the Defendant must be protected. For all of these reasons, the Defendant's Fifth Amendment double jeopardy claim fails with respect to the potential enhancement of his sentence for possession of crack.

Finally, the Defendant argues that the conversion of $1100 cash into drugs for purposes of sentencing violated the Double Jeopardy Clause. This argument is merely a variation on his earlier argument regarding the determination that the cocaine base is crack. The argument fails for the same reasons.

### C. The Crack vs. Cocaine Base Objection

Turning to Defendant's first objection, it appears he is making four separate arguments involving the distinction between crack and cocaine base. Defendant first argues that under 21 U.S.C. § 841(b), the term cocaine base means crack (exclusive-

ly). Because the jury did not make a specific finding that the cocaine was crack cocaine as opposed to cocaine base, he contends that the Government has not met its burden of proof under § 841(b); and, therefore, this Court should conclude that the Defendant was guilty only of the lesser included offense of cocaine possession, and use the Guideline range for powder cocaine, not the statutory minimum or the crack Guideline range.[7] Second, the Defendant contends that if this argument is rejected, the Court may not make the determination of whether the substance was crack by a preponderance of the evidence, even after *Booker/Fanfan*, but rather must use the beyond a reasonable doubt standard.[8] Third, even if this Court finds that the preponderance of the evidence standard applies at sentencing, the Defendant suggests that the quantum of proof adduced at trial was nevertheless insufficient to support a finding by this Court that the substance was crack.[9] Fourth, and finally, if this Court does not accept any of the foregoing arguments, the Defendant suggests that this Court sentence the Defendant to the mandatory minimum, rather than use the Guideline range for crack under U.S.S.G. 2D1.1 (2004).

7. The Defendant may have waived this objection at trial when he agreed with the Government and the Court that the jury should be discharged and not asked to decide the enhancement questions. (Tr., 1/13/05, at 1 (Defendant agreed with Court's position that "the majority's opinion in *Booker* and in *Fanfan* ... essentially precluded the use of [a] sentencing hearing and supplemental special verdict forms and a jury fact finding with respect to specific enhancement facts.").) Nevertheless, given the newness of the *Booker/Fanfan* decision at the time the Defendant agreed to discharge the jury (the *Booker/Fanfan* decision was issued only the day before), this Court will overlook any such waiver and address the merits of the Defendant's objection. *Cf. United States v. Leavitt*, 925 F.2d 516, 517 (1st Cir.1991) (taking notice of errors not called to attention of district court, stating that "the Guidelines still are relatively new; and [the First Circuit] has said that for that reason, at least for a time, it will tend to overlook a failure to make a Guideline-related argument in the court below") (citing *United States v. Plaza–Garcia*, 914 F.2d 345, 348 (1st Cir.1990) ("relative novelty of the guidelines makes an unnoticed mistake understandable")).

8. The Defendant argues that the Court may not find facts to support enhancements under the Guidelines generally. This is patently incorrect. It should be beyond serious question by now that the Court at the time of sentencing may find facts, by a preponderance of the evidence, that support enhancements under the Sentencing Guidelines. In *United States v. Antonakopoulos*, 399 F.3d 68, 75, 80 (1st Cir.2005), the First Circuit, citing to Justice Breyer's admonition in the Remedy Opinion of *Booker/Fanfan*, held that the error in *Booker/Fanfan* was that the Defendant's Guideline sentence was imposed under a mandatory Guideline system: "The error is not that a judge (by a preponderance of the evidence) determined the facts under the guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory guideline system." The First Circuit reaffirmed its holding in *United States v. Martins*, 413 F.3d 139, 152 (1st Cir.2005) (stating that "[o]ur holding in [Antonakopoulos] is pellucid that the Sixth Amendment is not violated simply because a judge finds sentencing facts under the guidelines; rather, the error is only that the judge did so pursuant to a mandatory guidelines system"). Thus, this Court finds that this aspect of the Defendant's objection is wholly without merit and rejects it.

9. The Court continued the sentencing hearing in this case in order to allow the Government to consider whether it wished to present additional evidence at the sentencing hearing in support of its argument that the cocaine base was in fact crack. The Government chose to rely on the evidence produced at trial and elected not to produce any additional evidence. The Defendant objected to allowing the Government to present additional evidence, but in light of the Government's decision not to do so, this argument is moot.

In support of these arguments, the Defendant relies primarily on the reasoning contained in three decisions by Judge Ponsor of the District of Massachusetts: *United States v. Thomas*, 360 F.Supp.2d 238 (D.Mass.2005) (issued on March 14, 2005), *United States v. Hubbard*, 369 F.Supp.2d 146 (D.Mass.2005) (issued on April 25, 2005), and *United States v. Person*, 377 F.Supp.2d 308 (D.Mass.2005) (issued on April 27, 2005). These three decisions seek to test the strength of the First Circuit's prior holdings regarding the meaning of the term cocaine base contained in § 841(b), as well as the level of proof required to prove that cocaine base is in fact crack cocaine.

Judge Ponsor's opinions raise several provocative questions that merit discussion. While Judge Ponsor makes a compelling case for revisiting the meaning of the term cocaine base, this Court believes that prior First Circuit holdings bind the district courts (and presumably the Circuit Court as well) to a broad definition of cocaine base. It would be inconsistent with these precedents to find, as Judge Ponsor suggests, that the definition of cocaine base contained in § 841(b) should be read to mean crack only. Therefore, the mandatory minimums contained in § 841(b) apply to this case.

### 1. The Statute and the Guidelines

The origins of the sentencing scheme for cocaine offenses begin with the Anti–Drug Abuse Act of 1986 ("the 1986 Act"), now codified at § 841(b). The 1986 Act arose out of an increasing sense of urgency over the growing use of drugs and the development of new forms of drugs, particularly crack cocaine.[10] As has been widely

---

10. While it has often been noted that the death of University of Maryland basketball star, twenty-two-year-old Len Bias, from a cocaine overdose was a factor contributing to congressional action culminating in the 1986 Act, *see generally*, William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 Ariz. L.Rev. 1233, 1249 (Winter 1996), Bias' death was only one in a series of cocaine-related events in the professional sports world that captivated national attention. Just eight days after the Bias tragedy, Cleveland Browns defensive back Don Rogers, just twenty-three years old, died of a cocaine overdose. As one writer noted in 1986,

> drug abuse is [noth]ing new in sports; it has just picked up a terrible new momentum.... Who can keep up with the cocaine box scores? From Mercury Morris to Mike Norris; from Parker (Dave) to Porter (Darrell) to Pryor (Aaron) to Peters (Tony); from Steve Howe to the Pittsburgh cocaine trial to the Tulane coke-for-points scam.... Six years ago the Atlanta Hawks' Terry Furlow crashed his car and died—with cocaine in his system. Four years ago the Montreal Expos' Tim Raines took to sliding headfirst in order not to break bottles of cocaine in his back pocket. Last winter former Tennessee quarterback Tony Robinson was indicted for cocaine dealing. This past NBA season, Micheal Ray Richardson, John Lucas and Quintin Dailey all fell afoul of cocaine. Right now, some players on the Virginia football team are under investigation for selling cocaine. Tomorrow somebody will snort up the harsh marks and no one will blink.

Rick Reilly, *When the Cheers Turned to Tears*, Sports Illustrated, July 14, 1986, at 28.

While the exposure of cocaine use among many highly visible athletes clearly played a role in the enactment of the 1986 Act, there were other elements in play as well. The "unexpected explosion of concern about drugs" in 1986, one writer noted, resulted from the confluence of many factors, including: a popular "shift in attitudes against substance abuse over the past five years" in response to "a cycle of widespread drug use that began in the mid–1960's"; the rise of cocaine addiction among the most affluent and politically influential parts of American society, reaching far beyond the inner city to America's suburbs and white-collar offices; the appearance of crack cocaine and its "devastating effects on neighborhoods of New York and Los Angeles, only blocks from the offices of major national news organizations"; and the approach of national elections—lead-

claimed in critical commentary, the 1986 Act passed without the usual deliberative process afforded to such important legislation. *See, e.g.,* David M. Zlotnick, *The War Within the War On Crime: The Congressional Assault On Judicial Sentencing Discretion,* 57 SMU L.Rev. 211, 219 & n. 52 (Winter 2004) (citing Eric E. Sterling, *The Sentencing Boomerang: Drug Prohibition Politics and Reform,* 40 Vill. L.Rev. 383, 408 (1996) (claiming "the careful, deliberate procedures of Congress were set aside in order to expedite passage of the bill")); Peter Kerr, *supra,* at A1 (quoting Florida Representative Claude Pepper in the second week of September 1986, stating that, "Right now, you could put an amendment through to hang, draw and quarter.... That's what happens when you get on an emotional issue like this.").

The central pillars of the 1986 Act are its schedule of mandatory minimum sentences for weight-based possession with intent to distribute, and the upward ratchet for recidivist offenders. Mandatory minimums under the statute begin at 5 and 10 years, respectively, depending on drug quantity, double for a second offense, and, in certain cases, mandate life imprisonment for a third. *See* 28 U.S.C. § 841(b)(1)(A)-(B). The quantity-based penalty scheme under the statute employs a 100:1 ratio for cocaine base to powder cocaine, which means that the amount of powder cocaine necessary to trigger the statutory mandatory minimum is 100 times the amount of cocaine base necessary to trigger the same minimum sentence. Thus, it takes 500 grams or more of powder cocaine to trigger a 5–year mandatory minimum penalty whereas only 5 grams of cocaine base triggers the 5–year minimum; it takes 5,000 grams (5 kilograms) of powder cocaine to trigger a 10–year mandatory minimum penalty under the statute, whereas 50 grams or more of cocaine base will trigger this same penalty.[11] Significantly, the term "cocaine base" is not defined anywhere in the statute.

While the U.S. Sentencing Commission ("Sentencing Commission" or "Commission") was formed pursuant to the Sentencing Reform Act of 1984, by 1986 it had not yet issued the Guidelines. In response to passage of the 1986 Act the Commission incorporated the statutory 100:1 crack-to-powder ratio in setting the Sentencing Guideline penalty ranges. The Commission determined that the statutory mandatory minimums would be used to set the base offense level under the Guidelines, and these base levels could then be increased depending upon the presence of other factors. The result was a system that ensured that the sentencing range for

---

ing the Democratic leadership in the House to press for passage "before press attention was lost and Congress recessed," and leaving few in Congress or the White House to oppose such a "popular and seemingly one-sided issue."

Peter Kerr, *Anatomy of the Drug Issue: How, After Years, It Erupted,* N.Y. Times, Nov. 17, 1986, at A1.

**11.** As the Sentencing Commission stated in its report to Congress in May 2002,

[b]ecause of the statutory and Guideline differentiation between crack cocaine and powder cocaine, the sentencing guideline range based solely on drug quantity is three to over six times longer for crack cocaine offenders than powder cocaine offenders with equivalent drug quantities, depending on the exact quantity of drug involved. In great part because of the difference in quantity-based penalties, in 2000 the average sentence for a crack cocaine offense was 44 months longer than the average sentence for a powder cocaine offense, 118 months compared to 74 months.

United States Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* p. v. (May 2002), *available at* http://www.ussc.gov/r_congress/02crack/2002crackrpt .htm. (2002) ("2002 Report").

most drug offenses would be higher than the applicable statutory mandatory minimum. In those cases where the range was lower, the mandatory minimum set the floor.

Like the statute, the Sentencing Guidelines at first did not define the term cocaine base. This changed in 1993 when Congress passed an amendment, submitted by the Sentencing Commission, U.S.S.G.App. C, amdt. 487 (Nov.1993), to the Sentencing Guidelines. This amendment defined cocaine base as crack, which is "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate [commonly known as baking soda], and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1(c) n.(D) (2004); *United States v. Richardson*, 225 F.3d 46, 49 (1st Cir.2000).

After 1993, therefore, in order to sentence a defendant under the Guideline provision for cocaine base, there must be a finding that the substance was crack cocaine. Under the Guidelines, forms of cocaine base other than crack are treated as ordinary cocaine, and are not subject to the enhanced penalties associated with crack. Congress, however, has not seen fit to similarly amend the statute, which has created considerable disagreement among the circuit courts over whether cocaine base under the statute refers to crack only, or all forms of cocaine base. As described in more detail below, the Sentencing Commission over the past eight years has made several attempts to fix the crack/powder cocaine disparity, without success.

2. *Lopez–Gil, Thomas, and the Circuit Split*

In 1992 the First Circuit decided the case of *United States v. Lopez–Gil*, 965 F.2d 1124 (1st Cir.1992). The *Lopez–Gil* panel was composed of Judges Campbell and Bownes, and Visiting Judge Brown of the Fifth Circuit. Before the panel was a direct challenge to the definition of cocaine base under § 841(b), as well as the pre–1993 Guidelines. As the court stated, "we must determine whether the substance at issue constitutes cocaine base or cocaine as defined by the statute and the Sentencing Guidelines.... The issue before us today requires us to determine the correct definition of cocaine base *as a matter of statutory interpretation.*" 965 F.2d at 1129 (emphasis added).

Initially, the panel issued an opinion finding that cocaine base meant only crack, citing the legislative history of § 841 as well as the Ninth Circuit's opinion in *United States v. Shaw*, 936 F.2d 412 (9th Cir. 1991). The panel's opinion drew a sharp dissent from Judge Brown, who clearly favored the Government's view that the term included crack but did not mean crack exclusively. Further, Judge Brown contended a direct finding by the District Court regarding whether the substance was or was not crack required remand.

On Petition for Rehearing, the panel withdrew the portion of the opinion which held that cocaine base meant crack and reversed itself, concluding the Government was correct in the first place. While noting that "Congress indeed was concerned primarily with the crack epidemic in enacting the legislation," the Court held that "it does not necessarily follow that the term 'cocaine base' includes *only* crack cocaine." *Lopez–Gil*, 965 F.2d at 1134 (emphasis in original). This per curiam opinion then drew a dissent from Judge Bownes who continued to adhere to the cocaine base equals crack view articulated in the origi-

nal panel opinion.[12]

In 2000, in *Richardson,* and more recently, in *United States v. Minton,* 9 Fed. Appx. 24, 26 (1st Cir.2001) (unpublished opinion), the First Circuit reaffirmed the holding of *Lopez–Gil,* not in the context of a challenge to the definition of cocaine base under § 841, but rather in the context of a sentence enhancement under the Guidelines.

Judge Ponsor, in the three decisions cited above, called the First Circuit's so-called "literal approach" into question, predicting that "the First Circuit, if squarely presented with the issue, will agree with the solid majority of circuits that have concluded that the narrower definition of 'cocaine base' applicable since 1993 to the Sentencing Guidelines [i.e., cocaine base equals crack cocaine only] applies equally to the statutes governing minimum mandatory sentences." *Hubbard,* 369 F.Supp.2d at 147; *accord. Thomas,* 360 F.Supp.2d at 242 (Ponsor, J.) (citing decisions from the Fourth, Seventh, Eighth, and Eleventh Circuits in which cocaine base under the statute was construed as crack cocaine only).

In these three cases, Judge Ponsor relies primarily upon the fact that in 1993 the Sentencing Commission amended the Guidelines to specifically limit the definition of cocaine base to crack for Guidelines purposes, and Congress approved of that amendment pursuant to 28 U.S.C. § 994(p). While the First Circuit reaffirmed the pre-amendment decision of *Lopez–Gil* in 2000 when it decided *Richardson,* Judge Ponsor suggests that the Circuit Court did so without recognizing or discussing either the 1993 amendment or the emerging circuit conflict over the question. Judge Ponsor predicts that when squarely confronted with the question,[13] the First Circuit will agree with the Eleventh Circuit and conclude that there is no reason " 'to assume that Congress meant for "cocaine base" to have more than one definition' and that its construction of the term in the Guidelines was intended to limit the reach of the statute as well." *Thomas* at 242 (quoting *United States v. Munoz–Realpe,* 21 F.3d 375, 378 (11th Cir.1994)).

If Judge Ponsor is correct in predicting that the First Circuit will adopt his position, the impact will be significant.[14] First, if cocaine base means only crack then it will become necessary for the Government to charge in the indictment, and for a jury to find beyond a reasonable doubt, that the substance in issue is crack (or else pursue a charge for the lesser included cocaine offense). Thus, crack becomes an element of the § 841 offense, not merely an enhancement under the Guidelines. Second, if a defendant is not found by a jury to be in possession of crack, as in the present case, then neither the mandatory minimum for cocaine base under § 841(b) nor the

**12.** Thus, only one currently sitting (now Senior) Judge of this Circuit (Judge Campbell) has actually expressed the view that cocaine base means more than crack in the context of a direct challenge to § 841.

**13.** All three cases are currently on appeal.

**14.** Assuming Judge Ponsor is correct and the Circuit Court adopts this view, the question of retroactivity would need to be addressed. Prospective application of such a holding would likely be quite manageable. As a prac-

tical matter, it is fairly simple for indictments under § 841 to allege that the cocaine base is crack. The verdict form could easily address the question as well. And the evidentiary burden, which the First Circuit has discussed on numerous occasions in the context of the Guidelines (discussed below) is not overly burdensome. The Government usually endeavors to meet this burden in all crack cases anyway because it seeks the highest available penalty under the Guidelines.

Guideline range for crack applies. In that event, defendants such as Perry could only be found guilty of the lesser included offense of possession with intent to distribute cocaine. *See United States v. Brisbane,* 367 F.3d 910, 914 (D.C.Cir.2004) ("Distribution of 'cocaine' is a lesser included offense of distribution of 'cocaine base.' The elements of the latter offense include all the elements of the former, plus proof that the type of cocaine is 'cocaine base' within the meaning of subsection (iii)."). The difference in potential sentences is dramatic, as the Court noted in *Lopez–Gil.* (By way of example, in the present case, the difference is a Guideline range of 33 to 41 months under the approach favored by Judge Ponsor and pressed in this objection, versus a 10–year mandatory minimum and a Guideline range of 188 to 235 months).

While Judge Ponsor relies heavily on the reasoning of the Eleventh Circuit in *Munoz–Realpe,* there is, in fact, a profound split in the circuit courts regarding this issue. Decisions of the Fourth, Sixth, Seventh, Eighth, Ninth, Eleventh, and D.C. Circuits have all disagreed with the literal approach espoused by *Lopez–Gil.* Conversely, the Second, Third, Fifth, and Tenth Circuits have joined the First in applying the broader and more literal interpretation of the term cocaine base. Examination of the various approaches of the circuit courts is useful in analyzing the strength of the argument made by Judge Ponsor and pressed by the Defendant here.

The Eleventh Circuit in *Munoz–Realpe* placed great emphasis on the 1993 amendment to the Sentencing Guidelines adopting the cocaine base equals crack approach. The Court argued that because

Congress allowed the amendment proposed by the Sentencing Commission to take effect pursuant to 28 U.S.C. § 994(p), Congress had signified its approval for this interpretation of the term. (Of course, this reasoning is questionable because congressional approval of a Sentencing Commission amendment in 1993 is not indicative of Congress' intent in passing the 1986 Act (as the Third Circuit pointed out in *United States v. Barbosa,* 271 F.3d 438, 466–67 (3d Cir.2001) discussed below).)

The Fourth Circuit approach relied more heavily on a detailed examination of the legislative history surrounding the enactment of § 841. *United States v. Fisher,* 58 F.3d 96 (4th Cir.1995). In *Fisher,* the court cited to the intent of Congress to "penalize more severely violations involving crack cocaine." *Id.* at 99. (citing 132 Cong. Rec. S14,288 (daily ed. Sept. 30, 1986)).

A more detailed account of the legislative history is found in the Seventh Circuit's initial exposition on the question in *United States v. Booker,* 70 F.3d 488 (7th Cir.1995).[15] This opinion reviews, in substantial detail, the legislative history of the 1986 Act. *Id.* at 492–93. It cites to statements by numerous legislators applauding the stiffer sentences for crack cocaine, as well as to committee reports on hearings concerning the emerging crisis of crack cocaine—hearings that formed the legislative run-up to the eventual passage of the 1986 Act. *Id.* The *Booker* court also noted that the 1993 Sentencing Commission amendment itself may evidence an intent to "penalize crack more heavily than other forms of cocaine." *Id.* at 494 n. 23.

*Booker* also provides a detailed scientific analysis of the terminology found in

---

**15.** This decision is not to be confused with the Seventh Circuit's decision in *United States v. Booker,* 375 F.3d 508 (7th Cir.2004), the *Booker* of the Supreme Court's now famous decision in *Booker/Fanfan* which made the Guidelines advisory.

§ 841.[16] Without repeating the details of the chemical composition of cocaine base, what is most critical is this: "[t]o a scientist, 'cocaine' and 'cocaine base' are synonymous; they both refer to a substance with the formula $C_{17}H_{21}NO_4$." *Id.* at 490. Cocaine is rarely used in its natural form, but rather it is converted into cocaine powder (a salt); the powder is then reprocessed to create a substance known as "freebase" (i.e., the base is freed from the hydrochloride and converted back to the chemical state it was in before it became a salt). There are various methods of doing this, but the product (freebase) is dangerous to ingest by smoking. A safer mechanism is to dissolve the cocaine hydrochloride with baking soda and water, boil the mixture until only a solid substance remains, and allow it to dry. This is what is commonly known as crack. *Id.* at 490–91. The *Booker* court found that while the chemical properties of the terms used in § 841(b) and Guideline section 2D1.1 (before the 1993 amendment)—cocaine and cocaine base—are the same, it was clear that Congress intended to punish crack more severely than powder cocaine. Therefore, the court rejected the argument that the rule of leniency required the terms to be treated the same. The Seventh Circuit reaffirmed its view that cocaine base means only crack in 1997 in *United States v. Adams*, 125 F.3d 586, 592 (7th Cir.1997), and again just several months ago in *United States v. Edwards*, 397 F.3d 570 (7th Cir.2005) (discussing circuit split and encouraging Supreme Court clarification).

The Eighth Circuit, agreeing with the Seventh Circuit's analysis of the legislative history of § 841(b), held, in *United States v. Crawford*, 83 F.3d 964 (8th Cir.1996), that "Congress intended the term cocaine base to refer to 'crack;'" and, therefore, the definition of cocaine base in § 841(b) is clear enough to provide adequate notice to all concerned regarding the differences in penalties between cocaine and cocaine base. *Id.* at 966; *see also United States v. Jackson*, 64 F.3d 1213, 1220 (8th Cir.1995) ("*A.S. Jackson* ")[17] (assuming cocaine base equals crack under statute based in part on 1993 amendment to Guidelines, stating that, "Congress has defined the substance—and its intention to impose punishment befitting the crime—with appropriate clarity.") (quoting *United States v. Blanding*, 53 F.3d 773, 776 (7th Cir.1995)).

The Sixth Circuit, too, has held that cocaine base equals crack, but has not provided a detailed analysis. *See United States v. Levy*, 904 F.2d 1026, 1033 (6th Cir.1990) (assuming cocaine base to be equivalent of crack, noting that "[defendant] recognizes the congressional intent behind the insertion of the phrase 'cocaine base' was to impose stiffer sentences upon those who traffic in crack cocaine," and stating that "[c]ocaine base is ... concentrated in rock-hard forms of various sizes").

A variant on these approaches is discussed by the D.C. Circuit in the recent case of *United States v. Brisbane*, 367 F.3d 910 (D.C.Cir.2004). In this case, the court concluded that Congress must have intended something more than simple cocaine, but not crack exclusively. *Id.* at 913–14. The *Brisbane* court eschewed the literal approach, stating that Congress "could hardly have intended to apply the

---

**16.** Much of this scientific information is reprised in the First Circuit's opinion in *United States v. Robinson*, 144 F.3d 104, 109 (1st Cir.1998).

**17.** This decision is not to be confused with the Second Circuit's 1992 decision in *F. Jackson*, which held that cocaine base under the statute includes all types of cocaine base, not just crack.

enhanced penalties to forms of cocaine base that are not smokeable or even consumable without further processing; while imposing the lesser penalties on defendants dealing in similar amounts of ready-to-snort cocaine hydrochloride." *Id.* at 913 (criticizing *Lopez–Gil* ). The court went on to note that two alternative approaches to the literal approach have emerged: first, the cocaine base equals crack model adopted by the Fourth, Sixth, Seventh, Eighth, and Eleventh Circuits noted above; and second, the "smokeable" standard adopted by the Ninth Circuit in *United States v. Shaw. Id.* at 913–14. The D.C. Circuit implied the latter approach was preferable because it did not "unduly narrow[ ]" the operation of the statute. *Id.* at 914 ("[I]t is unlikely Congress intended to limit the enhanced penalty provisions to one manufacturing method.") In the end, the *Brisbane* court did not resolve the question but simply vacated the conviction, because the Government had proven neither, and resorted to the lesser included offense of cocaine possession. *Id.* at 914–15.

The *Shaw* case from the Ninth Circuit, like *Booker* and others, relies largely on legislative history. *United States v. Shaw,* 936 F.2d 412 (9th Cir.1991). It's conclusion that "smokeability" is the test, however, is supported neither by legislative history, nor by the Sentencing Commission amendment of 1993. The *Shaw* decision is essentially a judicial rewrite of the statute—not an interpretation of Congress' intent.

These cases all express, in one form or another, that the meaning of the term cocaine base, contained in § 841(b), should be construed narrowly to mean crack cocaine because that is both what Congress intended in 1986 and what the Sentencing Commission found (and Congress approved) in 1993. With the exception of

*Shaw* (and perhaps *Brisbane,* which appeared to favor the *Shaw* approach over the narrower view espoused in *Booker, Fisher, Levy* and *A.S. Jackson* ), these cases suggest narrow construction best reflects the intent of Congress and the Sentencing Commission.

Cases on the other side of the ledger (other than *Lopez–Gil* and *Richardson* ) come from the Second, Third, Fifth and Tenth Circuits. These cases—*F. Jackson,* 968 F.2d 158 (2d Cir.1992); *United States v. Palacio,* 4 F.3d 150 (2d Cir.1993); *Barbosa,* 271 F.3d 438 (3d Cir.2001); *United States v. Butler,* 988 F.2d 537 (5th Cir. 1993); and *United States v. Easter,* 981 F.2d 1549 (10th Cir.1992)—all adopt a plain meaning approach to construction of the term cocaine base.

The Second Circuit, in *F. Jackson,* was persuaded that the broader definition should apply, based largely on Congress' use of what it deemed a chemical name (cocaine base) as opposed to the narrower colloquial term (crack). The court's analysis is persuasive, but may be called into doubt by the more technical discussion of the chemical components of cocaine, cocaine base, and crack contained in *Booker,* which highlights the lack of clarity in the statute. *See* 70 F.3d at 491. *Compare F. Jackson,* 968 F.2d at 162 ("The differences between cocaine base and cocaine are well enough defined to prevent arbitrary enforcement of the enhanced penalty provisions."), *with Booker,* 70 F.3d at 491 ("All forms of freebase cocaine, including crack, have the same chemical formula as cocaine"). Not long after *F. Jackson,* the Second Circuit rejected the new argument that the 1993 amendment should alter its conclusion. *Palacio,* 4 F.3d 150. The court noted that once the circuit court interprets a statute, that interpretation is binding, even in the face of subsequently

issued, contrary regulatory action. *Id.* at 154.

The Third Circuit in *Barbosa* gives thorough treatment to the dispute and discusses what was in 2001 a well-developed circuit split. *Barbosa,* 271 F.3d 438 (3d Cir. 2001). Significantly, for purposes of this objection, the *Barbosa* court found that it was unconstrained by principles of *stare decisis* regarding its own earlier statements expressing favor for the holding of *Munoz–Realpe.*[18] The *Barbosa* panel noted, however, that this statement was made only in the context of considering whether the Government must prove, by a preponderance of the evidence, that the cocaine base in issue was indeed crack, and clarified that the court had not yet confronted the precise question of what the term cocaine base means in § 841(b). Addressing the cocaine base issue, the court was persuaded that the reasoning of *F. Jackson* and *Palacio* concerning the impact of the 1993 amendment was correct. That is, the court held that the Sentencing Commission had no power to alter or amend the meaning of a statute passed by Congress, where the plain language and legislative history demonstrated congressional intent that " 'cocaine base' encompass[ ] all forms of cocaine base" under the statute. *Barbosa,* 271 F.3d at 467.[19]

The Tenth Circuit also adopted the approach of *F. Jackson,* but without detailed discussion. *See Easter,* 981 F.2d at 1558 n.7 (noting that plain language of statute controls in absence of congressional intent to limit cocaine base to crack cocaine). The Fifth Circuit has taken this view as well. *See Butler,* 988 F.2d at 543 (stating that "[a]lthough a substance does not ap-

pear to be crack cocaine, it may nevertheless be cocaine base within the meaning of § 841(b)").

These cases, all of which adopt the so-called literal approach, stand for three basic points critical to resolving the Defendant's objection here. First, they set forth a compelling argument that the broader reading of cocaine base is more consonant with the intent of Congress than the approach outlined in *Booker, Fisher, Levy,* and *A.S. Jackson.*

Second, these cases reject the suggestion that the 1993 amendment to the Sentencing Guidelines should impact the calculus. As the *Barbosa* court pointed out, "whatever merit we should impart to the Commission for promulgating guidelines in accordance with Congress' desire to punish more severely certain drug trafficking, its wisdom is not germane to our construction of Congress' inclusion of mandatory minimum sentences in the drug statute itself." 271 F.3d at 466 (citing *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("characterizing as 'dubious' the assumption that the Commission's guidelines are relevant to the construction of a sentencing statute")).

Third, both *Barbosa* and *Palacio* acknowledge the binding nature of circuit precedent, even where an event, such as the adoption of the 1993 amendment, has intervened. As noted in *Palacio,* even if the court found the 1993 amendment relevant and persuasive (which it did not), it could not change its statutory interpretation. 4 F.3d at 154 (citing *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992); *Maislin Industries,*

---

18. In the prior case of *United States v. James,* the Third Circuit stated that "[w]e find the *Munoz–Realpe* analysis to be persuasive." 78 F.3d 851, 858 (3d Cir.1996).

19. As Judge Ponsor has pointed out, the First Circuit has not addressed precisely the question of whether the 1993 amendment to the Guidelines likewise altered the meaning of the statute. *See Thomas,* 360 F.Supp.2d at 242.

*U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 130–31, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990)).

Defendant's objection relies upon Judge Ponsor's suggestion in *Thomas* that the First Circuit will conclude that it has not specifically answered the question of what the term cocaine base in § 841(b) means in the context of a direct challenge to the meaning of the statute; and that when it does, it will adopt the narrow reading afforded by *Munoz–Realpe, Booker,* and their kin. Judge Ponsor is correct when he states that *Robinson,* which reaffirmed the prior holding of *Lopez–Gil* after the enactment of the 1993 amendment, was not a direct challenge to the language of § 841(b), but rather a Guideline case. But that is not the case that matters. It is *Lopez–Gil* that cast the die on this point. That case involved a direct challenge to the meaning of the term cocaine base in § 841(b), and the First Circuit held (after initially going the other way) that the broad interpretation of cocaine base was the better one.

Under *Neal v. United States,* 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996), the First Circuit would presumably be bound to follow its own ruling on this statutory interpretation question. As the *Barbosa* court held:

> [W]e understand *Neal* to stand for [ ] the narrow and now unobjectionable proposition that a court must adhere to its prior decisions interpreting an act of Congress, even in the face of a later, contrary interpretation or definition issued by the Sentencing Commission.

271 F.3d at 464. Echoing this sentiment, the First Circuit has similarly stated that,

> One of the principles of statutory interpretation is that a 'settled construction of an important federal statute should not be disturbed unless and until Congress so decides.' *Reves v. Ernst &*

*Young,* 494 U.S. 56, 74, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (Stevens, J., concurring). We recognize that 'considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change [the courts'] interpretation of its legislation.' *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

*Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, United States Dep't of Labor,* 136 F.3d 34, 42 (1st Cir. 1998); *see also United States v. Lindia,* 82 F.3d 1154, 1162 (1st Cir.1996) (holding that district court's calculation of drug quantity under Guidelines for purposes of sentencing did not violate *stare decisis* under *Neal,* because such calculation did not conflict with any controlling sentencing precedent); *see generally, United States v. Hudson,* 970 F.2d 948, 959 (1st Cir.1992) (Selya, J., concurring) (stating that "in a multi-panel circuit, newly constituted panels are customarily bound by prior panel decisions squarely in point") (citing *Fournier v. Best Western Treasure Island Resort,* 962 F.2d 126, 127 (1st Cir.1992)). And, in any event, there is little doubt that this Court is bound by the holding of *Lopez–Gil.*

### 3. Resolving the Objection

■ The Defendant's objection rests on the contention that the First Circuit will revisit *Lopez–Gil,* discard it, and adopt the holding of *Munoz–Realpe* that Congress intended the words cocaine base in § 841(b) to mean crack—and only crack. The Defendant has found cause for hope in Judge Ponsor's decisions. However, this Court must, for the reasons articulated above, reject Judge Ponsor's view. This Court concludes that the broader interpretation of cocaine base is the law of the Circuit under *Lopez–Gil,* and that the Circuit (and this Court) is bound to follow it

unless and until Congress modifies the statute or the Supreme Court resolves the circuit split in favor of the more narrow view. Therefore, the statutory minimums contained in § 841(b), enhanced by § 851, apply to this case, in spite of the fact that the jury did not specifically find the substance to be crack.

The Defendant's fall-back argument is that the evidence at trial was insufficient to allow this Court to find, by a preponderance of the evidence, that the cocaine base was crack. This argument also fails. Numerous First Circuit decisions on this topic make clear that the quantum of proof required to show that a form of cocaine base is in fact crack is not as great as Judge Ponsor (or the panel in *Brisbane*) suggests that it should be. Once a court hears testimony from a chemist that the substance is cocaine base, there is not much distance to cover to conclude that the cocaine base is in the form of crack. Put simply, the term "crack" is merely the street name for the most common form of cocaine base.

In this case, Senior Forensic Scientist Michael Liberto, an expert in the field of forensic toxicology, testified. As a result of the tests he performed on the substance found in the Defendant's apartment, Liberto concluded it was cocaine base and not cocaine hydrochloride (cocaine powder). Next, the Court heard from a lay witness, Detective Paul Sylvestre, who identified the substance as crack, based upon its physical appearance. While it is true that this is not an overwhelming showing, it does not have to be. The First Circuit has made clear that the evidentiary gap between cocaine base and crack is not very wide, and can be bridged with lay opinion testimony. *United States v. Charles,* 213 F.3d 10, 24 (1st Cir.2000); *United States v. Martinez,* 144 F.3d 189, 190 (1st Cir.1998).

In this Circuit, the types of evidence relied upon by district courts to determine that a particular substance is crack cocaine under the Guidelines include: (1) a chemist's testimony that the substance was cocaine base, combined with an investigator's testimony that the substance was crack, and the defendant's own admission that he sold "rock," *see Robinson,* 144 F.3d at 109; (2) a chemist's testimony that the substance was cocaine base and that sodium bicarbonate (usually used in processing crack cocaine) was present, together with the testimony of three different law enforcement agents that the substance was crack, *see Richardson,* 225 F.3d at 50. *Accord Martinez,* 144 F.3d at 190 (holding that district court did not err in determining that cocaine base was crack cocaine, based on chemical analysis identifying cocaine base, together with competent lay testimony "bridg[ing] the evidentiary gap between cocaine base and crack cocaine" and refusing to require showing of smokeability (i.e., water solubility or melting point) for purposes of establishing crack cocaine under the Guidelines, since smokeability distinguishes cocaine base from powder cocaine, not from crack) *id.; see also Charles,* 213 F.3d at 24–25 (holding that district court did not err in determining that cocaine base was crack cocaine, based on competent scientific evidence from two chemists, plus competent lay testimony from police trooper and refusing to require showing of smokeability or purity of cocaine base) *id.; United States v. Ferreras,* 192 F.3d 5, 11 (1st Cir.1999) (district court did not err in determining that cocaine base was crack cocaine, based on competent scientific evidence from chemist, together with competent lay testimony of detective; showing of smokeability not required).

Here, it is clear that the Government sustained its relatively modest bur-

den of proving by a preponderance of the evidence that the cocaine base possessed by Perry was crack. While there was no evidence that the controlled substance contained sodium bicarbonate ("an admixture which the Guidelines themselves specifically identify as one signature for crack," *Thomas*, 360 F.Supp.2d at 240), nor any evidence that the Defendant knew he was selling crack, neither finding (although no doubt helpful) is required under either the statute or the advisory Guidelines. Likewise, while only one lay witness testified that based on the substance's physical appearance it was crack, no further testimony was necessary.

Therefore, as set forth in the PSR, the applicable Guideline yields an Offense Level of 34 and Criminal History Category of III, resulting in a Guideline range of 188 to 235 months. Of course, the determination that cocaine base means more than just crack does not end the inquiry. The question now becomes what does this Court do with this advisory Guideline range.

## IV. *The Sentence*

### A. *The Advisory Guidelines and § 3553*

Having ruled on the Defendant's objections to the PSR, this Court must now determine an appropriate sentence, giving due consideration to the Sentencing Guideline range applicable to this case (188 to 235 months), as well as to the factors set forth in the Sentencing Reform Act, 18 U.S.C. § 3553(a), which states as follow:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established for—

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

> . . . .

> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

In *Booker/Fanfan*, the Supreme Court directed district courts to consider the Guidelines after making the findings of fact necessary to rule on any adjustments or enhancements. Further, district courts are instructed to give consideration to the Guidelines in conjunction with the factors listed in § 3553(a). *See Booker/Fanfan*,

125 S.Ct. at 767 (Breyer, J., joined by Rehnquist, C.J., and O'Connor, Kennedy, and Ginsburg, JJ.) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when·sentencing."); *id.* at 764 ("Without the 'mandatory' provision, the [Sentencing Reform Act] nonetheless requires judges to take account of the Guidelines together with other sentencing goals.").

The Supreme Court provides no guidance regarding precisely what level of consideration district courts must give the Guidelines in order to arrive at a reasonable sentence. In addition, the First Circuit has not yet had the occasion to address this question. Various district courts have opined on the issue and, predictably, have developed differing approaches. *Compare United States v. Clay,* 2005 WL 1076243, at *1 (E.D.Tenn.2005) (holding that "guidelines, although advisory and only one factor among others to be considered in arriving at a reasonable sentence, are entitled to substantial weight in the sentencing decision"), *United States v. Wilson,* 350 F.Supp.2d 910, 925 (D.Utah 2005) (holding that the Guidelines should be given "heavy weight" and that non-Guideline sentences should be imposed only in "unusual cases for clearly identified and persuasive reasons"), *and United States v. Peach,* 356 F.Supp.2d 1018 (D.N.D.2005) (holding that Guidelines should be given "substantial weight" because they provide a "presumptively reasonable" sentence), *with United States v. Ranum,* 353 F.Supp.2d 984 (E.D.Wis.2005) (holding that equal weight should be given to each factor listed in § 3553(a) and courts must resolve conflicts between § 3553 factors and Guidelines), *United States v. Myers,* 353 F.Supp.2d 1026 (S.D.Iowa 2005) (same), *Simon v. United States,* 361 F.Supp.2d 35 (E.D.N.Y.2005) (holding that Guidelines should be accord-

ed the same weight. as each other factor listed in § 3553(a)), *and United States v. Jaber,* 362 F.Supp.2d 365, 367 (D.Mass. 2005) (stating that " 'advisory' does not mean a regime without rules, or a return to the standardless sentencing which preceded the [Sentencing Reform Act]. Nor does it mean slavish application of the Guidelines under the guise of fair 'consideration,' an approach which is now unconstitutional. 'Advisory' means something in-between . . .").

Balancing the advisory Guideline range with the factors set forth in § 3553(a) cannot be reduced to an exact science, and this Court will refrain from embracing any formulaic approach to this process. As a practical matter, it seems appropriate to begin the sentencing process with the presumption that the range determined by the Guidelines is reasonable. The sentencing judge must start somewhere when determining an appropriate and reasonable sentence, and the most sensible and obvious place to start is with the advisory range established by the Guidelines. In addition to being practical, this approach promotes consistency and uniformity in sentencing among like cases, among judges within a given district, and from district to district, by respecting the Guidelines' framework. It matters little whether starting with the advisory range and considering that range presumptively reasonable going into an evaluation of the sentence in the context of § 3553 is denominated "substantial weight" or "heavy weight." What does matter is that the Court respects the twin goals of fairness and consistency (goals generally pursued by the guidelines) in its attempt to craft a reasonable sentence.

In most cases, this approach produces a sentence consistent with the advisory Guideline range. There have been exceptions, of course, and this Court has varied from the advisory Guideline range on occa-

sion, by sentencing both above and below the range. This Court's approach is not only consistent with the approach of other judges in this District,[20] but also appears consistent with data compiled by the United States Sentencing Commission.

Sentencing Commission data reveals that in the post-*Booker/Fanfan* period, 61.3% of sentences fell within the applicable Guideline range, and 24.1% were below-range government-sponsored/ § 5K downward departures. Therefore, 13.1% of sentences imposed were below the Guideline range for reasons other than government-sponsorship or § 5K: 3.4% were denominated "departures"; 9.7% as non-Guideline sentences.[21] The remaining 1.4% of sentences were above the Guideline range, and included both government-sponsored/ § 5K upward departures and non-Guideline sentences. U.S. Sentencing Commission, Special Post–Booker Coding Project, *Information for All Cases—Cases Sentenced Subsequent to U.S. v. Booker (Data Extraction as of July 12, 2005)*, Aug. 3, 2005, at 1, available at: http://www.ussc.gov/Blakely/_080805.pdf.

When pre-*Booker/Fanfan* Sentencing Commission data is compared with post-*Booker/Fanfan* Sentencing Commission data, the results reveal that while judges are imposing below-guideline sentences at a great rate, sentencing practices post-*Booker/Fanfan* are generally consistent with pre-*Booker/Fanfan* practices. For example, for the year 2003, 7% of sentences were below the Guideline range for reasons other than government-sponsorship or substantial assistance under § 5K1.1, and the remaining .8% of sentences were above the Guideline range. United States Sentencing Commission, *2003 Sourcebook of Federal Sentencing Statistics* 56 n. 2, 57, 59 n. 2. It appears judges now depart or issue non-Guideline sentences at a rate of about 13%, versus 7% in 2003.[22] Given that judges presently enjoy complete discretion regarding whether or not to follow the Guidelines, this change is arguably modest and demonstrates both judicial restraint and respect for the overarching goals of the Sentencing Reform Act, consistency and fairness across the system.

B. *Crack vs. Powder Cocaine Controversy*

For over a decade, the Sentencing Commission has urged an overhaul of the law concerning sentences in cocaine cases, particularly crack cases. The crack/powder cocaine controversy has long been fodder

---

**20.** An informal sampling of sentencing data in this District post-*Booker/Fanfan* reveals that approximately 67% of sentences were within the Guideline range, while approximately 17% of sentences were below the range (excluding government-sponsored/ § 5K downward departures). Above-range sentences (excluding those relying on upward departure provisions in the Guidelines) were statistically insignificant.

**21.** These statistics necessarily lack some precision because of the confusion prevailing in the immediate aftermath of *Booker/Fanfan*. For example, many courts (including this one), for a time, imposed sentences which were called non-Guideline sentences but which could have been handled as departures. At this point, it is likely that most, if not all, judges have returned to utilizing the departure regimen where it fits, and only using non-Guideline sentences in situations that cannot fit into the departure scheme.

**22.** This Court is unable to determine whether the up-tick in departure/non-Guideline sentences is attributable to one or more specific causes, such as the crack/powder disparity discussed in the next section. The Sentencing Commission is in the process of compiling this data. The Court suspects, however, based in part on the non-scientific review of sentences in this District, that in the aftermath of *Booker/Fanfan*, a significant portion of the increase will be attributable to this disparity.

for criticism within both the criminal law community, in general, and the Sentencing Commission, in particular. Recently, that controversy has even emerged in mainstream media. *See* Stephen J. Dubner & Steven D. Levitt, *Up in Smoke,* The New York Times Magazine, Aug. 7, 2005, § 6, at 15. While numerous commentators and courts expressed criticism of the disparity long before the Supreme Court's opinion in *Booker/Fanfan,*[23] this decision gives new vitality to the crack/powder cocaine sentencing controversy. No longer is the crack/powder disparity solely a source of frustration for sentencing judges who must impose sentences under a mandatory system. Now sentencing courts *must* consider this disparity in the context of the § 3553 factors and must also vary from the Guideline range if the Guideline sentence

is not consonant with the purposes of § 3553.

In order to fully grasp the problem with the crack/powder disparity as it concerns the § 3553 factors, one need look no further than the work of the Sentencing Commission over the last 10 years. In 1995, by a 4 to 3 vote, the Sentencing Commission submitted to Congress a proposed amendment to the Sentencing Guidelines that would have *equalized* the penalties for powder cocaine and crack cocaine. Congress, however, passed, and the President signed, legislation disapproving the proposed amendment. In 1997, the Sentencing Commission issued a report urging congressional consideration of a range of alternatives for revising the cocaine penalty scheme.[24] Congress took no action on the report. In its May 2002 report, the

**23.** *See, e.g., United States v. Dumas,* 64 F.3d 1427, 1432 (9th Cir.1995) (Boochever, J., concurring); *United States v. Willis,* 967 F.2d 1220, 1226 (8th Cir.1992) (Heaney, J., concurring); *United States v. Clary,* 846 F.Supp. 768 (E.D.Mo.1994), *rev'd,* 34 F.3d 709) (8th Cir.1994); *United States v. Patillo,* 817 F.Supp. 839 (C.D.Cal.1993); David A. Sklansky, *Cocaine, Race, and Equal Protection,* 47 Stan. L.Rev. 1283 (July 1995); Matthew F. Leitman, *A Proposed Standard of Equal Protection Review for Classifications Within the Criminal Justice System that Have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines' Classification Between Crack and Powder Cocaine,* 25 U. TOL. L.Rev. 215 (1994); *The Debate on 2002 Federal Drug Guideline Amendments,* 14 Fed. Sent. R. 123, 188–242 (Nov./Dec.2001—Jan./Feb.2002); *Rethinking the Crack Cocaine Ratio,* 10 Fed. Sent. R. 179, 184–208 (Jan./Feb.1998).

**24.** The Sentencing Commission, of course, was not alone in its criticism of the crack/powder sentencing disparity during this time. Following the Sentencing Commission's issuance of the 1997 report, then Attorney General Janet Reno and Director of the Office of National Drug Control Policy, Barry R. McCaffrey, sent a letter to President Clinton recommending raising the minimum threshold for crack to 25 grams and raising the corresponding threshold for powder co-

caine to 250 grams. Roger W. Haines, Jr. et al., *Federal Sentencing Guidelines Handbook* 557–58 (Nov.2004 ed.). On July 22, 1997, the Clinton administration followed suit, proposing a ratio of 10:1. *Simon,* 361 F.Supp.2d at 45. And on September 16, 1997, twenty-seven federal judges, all former U.S. attorneys, sent a letter to both House and Senate Judiciary Committees "strongly recommend[ing] that the disparity between the penalties for crack and powder cocaine be eliminated, or, at a minimum, drastically reduced." Haines et al., *supra,* at 558. Also during this period, it appears that many judges quietly engaged in an effort to address the disparity and the perceived unfairness of mandatory minimum drug sentences. *See* David M. Zlotnick, *supra,* at 223 n. 90 (contending that prosecutors and judges have together endeavored to bring some rationality to the sentencing system on a case by case basis) (citing Frank O. Bowman, III & Michael Heise, *Quiet Rebellion? Explaining Nearly a Decade of Declining Federal Drug Sentences,* 86 Iowa L.Rev. 1043 (2001); Frank O. Bowman, III & Michael Heise, *Quiet Rebellion II: An Empirical Analysis of Declining Federal Drug Sentences Including Data from the District level,* 87 Iowa L.Rev. 477 (2002)).

Sentencing Commission has once again implored Congress to act to address the unjustified disparity between powder and crack cocaine sentences. Review of the Sentencing Commission reports leaves little doubt that the Guidelines' penalties for crack lack any principled justification that can withstand scrutiny under § 3553.

The Sentencing Commission's findings are compelling.[25] In summary, the Commission concluded that the current penalties for crack cocaine exaggerate the relative harmfulness of crack cocaine, particularly in comparison to powder cocaine. While the Commission conceded that a precise quantification of the difference between crack and powder is impossible to determine, the research simply does not justify the 100:1 drug quantity ratio contained in current law.

Four specific Commission findings are worthy of emphasis. First, the feared epidemic of crack cocaine never materialized in the way it was envisioned by Congress at the time of the passage of these laws. Second, the current penalties sweep too broadly and apply too frequently to low level offenders, resulting in a seemingly unintended "penalty gap" between high level and low level offenders. This "penalty gap" appears to widen for offenders with the lowest quantities and the least criminal history, contrary to basic principles of sentencing policy.

Third, the current 100:1 ratio overstates the seriousness of most crack cocaine offenses and fails to provide adequate proportionality. In this regard, the Commission stated that many of the beliefs which appeared to underlie the passage of the 1986 Act and the rejection of the amendments proposed in 1995 (particularly violence) are no longer apposite.

Fourth, and finally, the Commission found that the current penalty structure disparately impacts minorities. While the Commission conceded that it is difficult to empirically study this issue, approximately 85% of the offenders sentenced for crack cocaine violations are black (in the year 2000) and that this leads to, at the very least, a perception that the crack/powder disparity is racially-motivated.

As a result of its findings, the Commission recommends both the elimination of the 100:1 drug quantity ratio and the adoption, by Congress, of a "three-pronged approach" for revising cocaine sentencing laws and policy. This three-prong approach is as follows:

(1) increase the five-year mandatory minimum threshold quantity for crack cocaine offenses to at least 25 grams and the ten-year threshold quantity to at least 250 grams (and repeal the mandatory minimum for simple possession of crack cocaine).

(2) direct the Commission generally to provide appropriate sentencing enhancements in the primary drug trafficking guideline to account specifically for (a) involvement of a dangerous weapon (including a firearm); (b) bodily injury resulting from violence; (c) an offense under 21 U.S.C. §§ 849 (Transportation Safety Offenses), 859 (Distribution to Persons Under Age Twenty–One), 860 (Distribution or Manufacturing in or Near Schools and Colleges), or 861 (Employment or Use of Persons Under 18 Years of Age); (d) repeat felony drug trafficking offenders; and (e) importation of drugs by of-

---

**25.** This Court will not repeat all of the Commission's findings here, but rather refers readers to the 2002 Report, *available at* http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm.

fenders who do not perform a mitigating role in the offense.

(3) maintain the current statutory minimum threshold quantities for powder cocaine offenses (understanding that the contemplated specific guideline sentencing enhancements would effectively increase penalties for the more dangerous and more culpable powder cocaine offenders). ·

2002 Report at viii.

The above highlights of the Sentencing Commission's conclusions and proposed solutions are supported by an overwhelming amount of authority—empirical, scholarly, and otherwise.[26]   In fact, it is virtually impossible to find any authority suggesting a principled basis for the current disparity in sentences.   Courts now face the question of how to factor the sound criticism and conclusions of the Sentencing Commission, and others, regarding the disparity into the § 3553 analysis in a crack cocaine sentencing such as this.

█   Section 3553(a)(2) requires the Court to consider four major factors: (1) the sentence should reflect the seriousness of the offense and promote respect for the law and provide just punishment; (2) the sentence should adequately deter criminal conduct (sometimes referred to as general deterrence); (3) the sentence should protect the public from further crimes by the defendant (occasionally referred to as specific deterrence); and (4) the sentence should provide the defendant with needed education/vocational training, medical care, etc.   These goals should be accomplished with a sentence that is "sufficient, but not greater than necessary" to achieve them. 18 U.S.C. 3553(a).   In this case, there is little doubt that the advisory Guideline range sentence (188 to 235 months) is substantially greater than is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide for adequate general and specific deterrence.

If this case concerned powder cocaine, instead of crack, the quantities involved, combined with the 2–point adjustment because of proximity to a school, would result in a sentence range of level 18 (versus a level 34).   At a level 18, with a criminal history category of III, the sentence would be 33 to 41 months.[27]   A sentence in the range of 188 to 235 months would operate as a specific deterrent to further crimes by this Defendant; but this can be said of any extremely long sentence.   So long as the Defendant is in prison, he is "deterred" from further committing criminal offenses. It might also be possible to argue that a Guideline sentence would operate as a general deterrent to cocaine trafficking, because it would continue to send the message that crack cocaine will be treated with extremely harsh penalties.   But this point is highly debatable.

In actuality, the disparity more probably means that sophisticated, large scale drug traffickers will usually deal in powder, while lower level dealers deal crack.   This is a source of the sentencing gap identified by the Commission.   Thus, the lengthy sentences for crack do not deter large

---

**26.**   The supporting authority is legion.   A recent decision of the United States District Court for the Eastern District of Wisconsin, *United States v. Smith*, 359 F.Supp.2d 771 (E.D.Wis.2005) (Adelman, J.) contains a thorough history of the enactment of the Anti-Drug Abuse Act and compiles additional scholarly and judicial criticism of the crack/powder disparity, as well as additional citations to Sentencing Commission reports and statements to Congress critical of the disparity.   *See also Simon*, 361 F.Supp.2d 35.

**27.**   As previously mentioned, of course, the 10–year mandatory minimum sets the floor in this case.

scale dealers from the cocaine trade; they simply cause the risk to be distributed to lower level dealers.

Further, when a Guideline sentence involves a nearly impossible-to-justify disparity such as this, the sentence neither accurately reflects the seriousness of the offense, nor promotes general respect for the criminal justice system. As stated by the Sentencing Commission in its 2002 report, gross sentencing disparities actually promote less respect for the law because the penalties suggest untoward discrimination and fall more heavily on smaller offenders and those with a lower criminal history category, leaving more significant drug dealers facing shorter sentences.

An example from this Court's own docket demonstrates this point. This Court recently sentenced a major cocaine dealer, Shawn Montegio, to 188 months for the same crime that Defendant Perry was convicted of, except the substance was powder cocaine.[28] Montegio was caught with 10 kilograms of powder cocaine imported from New York. He had tens of thousands of dollars in cash stashed at various locations, and headed a major drug operation (for which his offense level was adjusted upward by several points). Defendant Perry, in contrast, was in possession of 29.47 grams of crack (not including the 11 grams converted from drug proceeds). The number of police officers involved in the Montegio investigation, and the complexity of the law enforcement methods used to surveil and catch him (highly advanced video and audio surveillance equipment, multiple undercover units, pole cameras, wire taps, etc.), all reflect the sophistication of his operation. *See United States v. Montegio,* 274 F.Supp.2d 190 (D.R.I.2003) (Suppression Hearing Decision describing the surveillance and arrest of Montegio). Without doubt, Montegio was a far more serious criminal drug trafficker and a far more serious threat to the community than Perry. Yet the Guidelines treat them as equivalent. This cannot be justified in any principled way.

This Court's conclusion that a non-Guideline sentence is called for is also supported by the vast majority of district courts that have evaluated the crack/powder cocaine sentencing disparity in the wake of *Booker/Fanfan.* For example, in *Smith,* 359 F.Supp.2d 771, the district court imposed a term of incarceration of eighteen months on a defendant convicted of possession of more than 50 grams of cocaine base, where the Guidelines recommended a minimum of 121 months, and where a 10-year statutory mandatory minimum also applied.[29] In reaching its conclusion, the court considered the Guidelines' "notorious" 100 to 1 ratio between crack and powder cocaine, which "lacks persuasive penological or scientific justification." *Smith,* 359 F.Supp.2d at 777; *see id.* at 778–79 (noting that "assumptions underlying the disparity between crack and powder are unsupported by data:" the 100:1 ratio 'does not target serious drug traffickers; "the prevalence of aggravating conduct in crack cases does not differ substantially from the prevalence in powder cocaine offenses:' " reliable evidence has failed to show that crack is more danger-

---

**28.** Montegio also received five additional years for the use of a gun, but this additional five years is not relevant for the comparison.

**29.** The Government's § 3553(e) motion in this case allowed the Court to impose a sentence below the statutory mandatory minimum. *See* 18 U.S.C. § 3553(e) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.").

ous than powder; and the use of crack has not grown but rather has decreased since the mid–1980s).

Judge Adelman found especially troubling the racially disparate impact created by the 100:1 ratio. *Id.* at 780 (noting that crack-related penalties disproportionately impact black defendants, who comprise "between 80% and 90% of federal crack cocaine defendants, compared to just 20% to 30% of powder cocaine offenders," and who, primarily because of this disparity, receive sentences that are, on average, more than two years longer than those of white defendants). *See also United States v. Leroy*, 373 F.Supp.2d 887, 896 (E.D.Wis. 2005) (Adelman, J.) (using 20:1 ratio, imposing term of incarceration of 70 months where Guidelines recommended minimum of 100 months); *id.* ("a court acts well within its discretion under § 3553(a) in sentencing below the guideline range to account for the unreasonable inflation of sentences called for in crack cases"); *United States v. Beamon*, 373 F.Supp.2d 878, 887 (E.D.Wis.2005) (Adelman, J.) (invoking 20:1 ratio and § 3553(e) and imposing term of incarceration of 51 months where Guidelines recommended a minimum of 121 months and a 10–year statutory mandatory minimum also applied).

In *Simon*, the district court likewise declined to follow the Guidelines' 100:1 ratio, stating that the sentencing range of 324–405 months recommended by the Guidelines "substantially overstate[d] the seriousness of the offense, particularly when compared with offenses involving comparable quantities of powder cocaine." 361 F.Supp.2d at 49. "Had Simon been arrested with an equivalent amount of powder cocaine," the court reasoned, "the range would be a mere 108 to 135 months and he would, in all likelihood, be free." *Id.* at 43. In addition to this disparity in sentencing, the court noted the substantial

deviation between the Guidelines' harsh treatment of crack cocaine and public opinion, the unfounded assumptions about crack cocaine that underlie the Guidelines, and the court's obligation under § 3553(a)(2)(B) to impose a sentence "no[ ] greater than necessary ... to provide[ ] adequate deterrence to criminal conduct." *Id.* at 39. Based on these factors, the court concluded that the defendant's offense did not warrant a penalty based upon the 100:1 ratio. *Id.* at 46. Instead, the court looked to the 20:1 ratio recommended by the Sentencing Commission and the 10:1 ratio recommended by the Clinton administration—both of which resulted in a sentencing range of 210 to 262 months, well below the Guidelines' recommended sentencing range. *Id.* at 48–49.

In *United States v. Clay*, No. 2:03CR73, 2005 WL 1076243, at *6 (E.D.Tenn. May 6, 2005), the court held that the "unjustified disparity in the 100:1 [quantity] ratio for punishment between cocaine base or crack and powder cocaine" outweighed the Guidelines' recommended sentencing range. In that case, a jury convicted the defendant of "the offense of conspiracy to distribute and to possess with the intent to distribute 50 grams or more of cocaine base or crack." *Clay*, 2005 WL 1076243, at *1. The quantity of drugs used by U.S. Probation to calculate the Guidelines range, moreover, was much higher, totaling 496 grams. *Id.* at *3. Notwithstanding the "substantial weight" to be accorded the Guidelines, the court concluded that a Guidelines sentence was "not necessary to reflect the seriousness of the offense, to promote respect for the law or to provide just punishment for the offense." *Id.*

After comparing the defendant's recommended Guidelines range based on 496 grams of crack (235 to 293 months, or 188 to 255 months based on the jury's finding of at least 50 grams) to sentencing ranges based on various other ratios, the *Clay*

court concluded that a non-Guidelines sentence of 156 months of incarceration was warranted. *Id.* at *6. While the court did not specify whether it calculated the sentence based on 496 grams of crack or 50 grams, in either case, the sentence reflects a substantial variance from the 100:1 ratio (i.e., a 156–month sentence based on 496 grams reflects a roughly 5:1 ratio, while this same sentence based on 50 grams is slightly above a 20:1 ratio). *Id.; see also United States v. Castillo,* No. 03 CR. 835(RWS), 2005 WL 1214280, at *5 (S.D.N.Y. May 20, 2005) (noting disparity under Guidelines for offenses involving crack versus powder cocaine, and adopting *Smith's* 20:1 ratio in imposing 87–month term of incarceration on defendant convicted of possession with intent to distribute crack and powder cocaine, where Guidelines recommended minimum of 135 months).

Several recent sentencings in this district reflect this view as well. *See United States v. Vasconcelos,* No. 04–081ML, Tr. of Sentencing at 18, 22 (Lisi, J.) (D.R.I. Jan. 28, 2005) (imposing term of incarceration of 60 months where Guidelines recommended a minimum of 84 months, noting that a "rather small amount of crack cocaine" triggered sentence "far in excess of what might be considered . . . appropriate or just," and that "crack guidelines . . . almost universally are believed to be way too high"); *United States v. Bilby,* No. 04–38, Tr. of Sentencing at 21 (Torres, J.) (D.R.I. Jan. 14, 2005) (imposing term of incarceration of 66 months where Guidelines recommended a minimum of 87 months based, in part, on the Guidelines' "disproportionate increase in the punishment because the offense is crack cocaine as opposed to powder cocaine").[30]

The decisions of other district courts, while falling short of imposing non-Guidelines sentences based directly on the crack cocaine/powder cocaine disparity, nevertheless support below-Guideline sentences in crack cases. *See, e.g., United States v. Franklin,* No. 04–4000701SAC, 2005 WL 1330959, at *1 n. 1 (D.Kan. May 25, 2005) (stating that while in Tenth Circuit, "disparity in the Sentencing Guidelines between cocaine base and powder cocaine is not a valid basis for downward departure," this is not to say that post-*Booker/Fanfan,* "a sentencing court may not consider this disparity in weighing the guideline sentencing factor and in evaluating the seriousness of the offense"); *Williams,* 372 F.Supp.2d at 1339 n. 8 (imposing non-Guidelines sentence, noting "substantial criticism of the sentencing disparity between powder cocaine and crack cocaine— the same drug in different forms," together with "evidence suggesting that this disparity has a discriminatory impact on African Americans of whom [defendant] is one"); *United States v. Tabor,* 365 F.Supp.2d 1052, 1058 n. 9 (D.Neb.2005) (describing crack cocaine Guidelines as "deeply troubl[ing]," and stating that while it would not implement Sentencing Commission's views post-*Booker/Fanfan* out of deference to Congress,[31] the court personally favored Commission's 2002 approach to crack cocaine (20:1 ratio)); *id.* at 1053 ("The bottom line is that poor people are the ones that use crack cocaine and mostly minorities." (quoting 140 Cong. Rec. H2694 (daily ed. Apr. 21, 1994) (statement of Rep. Hughes))); *United States v. Biheiri,* 356 F.Supp.2d 589, 594 n. 7 (E.D.Va.2005) ("a sentencing judge may consider that in light of the other § 3553 factors, the Sen-

---

30. Thus, all three active District Judges in this District appear to agree that non-guideline sentences are appropriate in cases involving crack.

31. For the reasons stated in note 35 *infra* and elsewhere in this Memorandum, this Court believes this view is inconsistent with the holding of *Booker/Fanfan.*

tencing Guidelines range is inappropriate because that range is based on ... inapposite policy judgments of the Sentencing Commission, such as the severity of the crack cocaine sentencing ranges"); *cf. United States v. Moreland,* 366 F.Supp.2d 416, 421–22, 424 (S.D.W.Va.2005) (imposing non-Guidelines sentence on defendant convicted of crack-related offense, in light of excessive sentence recommended by Career Offender provisions of Guidelines); *United States v. Carvajal,* No. 04 CR 222AKH, 2005 WL 476125, at *5–6 (S.D.N.Y. Feb.22, 2005) (same); *United States v. Nellum,* No. 2:04–CR–30–PS, 2005 WL 300073 (N.D.Ind. Feb.3, 2005) (imposing non-Guidelines sentence on defendant convicted of crack-related offense,

based, in part, on random nature of Guidelines' quantity-based approach).

The growing sentiment in the district courts is clear: the advisory Guideline range for crack cocaine based on the 100:1 ratio cannot withstand the scrutiny imposed by sentencing courts when the § 3553 factors are applied. This Court, too, will not blindly apply the Guideline range, for to do so would be to disregard the Supreme Court's directive in *Booker/Fanfan* to fashion a reasonable sentence in light of the § 3553(a) factors.[32] As to the appropriate ratio to apply, this Court believes a 20:1 ratio (as suggested by the Commission in its 2002 report)[33] makes the most sense. In this case, the 20:1 ratio would yield an advisory Guideline range of

**32.** Because the Guidelines are now advisory, pre-*Booker/Fanfan* authority in this Circuit holding that the recommendations of the Sentencing Commission regarding the disparity between punishments for crack and powder cocaine is not a ground for departure under the Guidelines is distinguishable. *E.g., United States v. Andrade,* 94 F.3d 9, 14–15 (1st Cir. 1996); *United States v. Sanchez,* 81 F.3d 9, 11 (1st Cir.1996); *United States v. Camilo,* 71 F.3d 984, 990 (1st Cir.1995) ("In light of the October rejection of the Sentencing Commission's April amendment, we cannot accept the argument that the Sentencing Commission was derelict in its duty to weigh penalties."); *see also United States v. Martin,* 221 F.3d 52, 58 (1st Cir.2000) (stating that "departures (up or down) based on the inherently speculative possibility that the guidelines might under other circumstances be modified are impermissible"); *cf. Franklin,* 2005 WL 1330959, at *1 n. 1 (holding that while Tenth Circuit had "specifically and clearly" held that crack/powder disparity was not valid basis for departure, district court was free to consider this disparity in determining sentence post-*Booker/Fanfan*). Furthermore, while this Court rejects the application of the 100:1 ratio in determining an appropriate sentence under § 3553, this Court takes no position on whether the crack/powder disparity is unconstitutional. *See United States v. Berrios,* 132 F.3d 834, 842 (1st Cir.1998) (holding that crack/powder disparity was constitutional, stating that "[u]ntil the en banc court of this

circuit, the U.S. Supreme Court, or Congress itself accepts this assertion of disparity and finds it untenable, challenges to the sentencing guidelines based on the disparity between sentences for crack cocaine and powder cocaine will continue to fail."); *accord. United States v. Singleterry,* 29 F.3d 733, 740 (1st Cir.1994) (holding that crack/powder disparity was neither irrational nor racially motivated).

**33.** It has been suggested by the Government that utilizing the findings of the Sentencing Commission to justify a non-Guideline sentence is effectively rejecting the will of Congress because Congress affirmatively rejected the Sentencing Commission's proposed amendment in 1995 to eliminate the 100:1 ratio. There is a simple response to this. To adopt this view would effectively impose the mandatory Guideline regime rejected by *Booker/Fanfan.* Congress approved the entire Guideline system; the Supreme Court held it must function as an advisory system only and otherwise is unconstitutional. Congress' rejection of the 1995 Amendment must be treated no differently. That is, if Congress' rejection of the 1995 amendment was considered binding on courts with respect to whether the crack guidelines must be applied it would lead to the same constitutional problem that plagued the Guidelines as a whole. The only sensible way to resolve this problem is to consider this congressional action as part of

97 to 121 months [34] (subject, of course, to the application of the mandatory minimum 10–year sentence).

## VI. *Conclusion*

The advisory Guideline Range of 188 to 235 months is greater than required to reflect the purposes of sentencing as outlined in § 3553(a). If the powder cocaine Guidelines were used in this case, the Defendant would be facing an approximately three-year sentence. Here, § 860 requires a mandatory minimum sentence which, by application of § 851, is 10 years. The Guideline disparity between powder cocaine (approximately three years) and crack cocaine (approximately fifteen years) in this case is far greater than necessary to promote the principles outlined in § 3553. While it may be a moot point to determine precisely where in the range between 3 and 15 years this case would have fallen if not for the application of the mandatory minimum 10–year sentence, the Court believes a 20:1 ratio effectively meets the criteria of § 3553 and the objectives of sentencing policy. This would have yielded a sentencing range of 97 to 121 months.[35] This conclusion is supported by the findings and recommendations of the Sentencing Commission, and the numerous decisions discussed above.

The conviction on count I is vacated. The Defendant is sentenced to 10 years imprisonment on Count II; to be followed by eight years of supervised release with special conditions as follows: the Defendant must participate in a program of mental health treatment approved by Probation, and must participate in a program approved by Probation for substance abuse, which may include testing to determine whether the Defendant has reverted to the use of alcohol or drugs (the Defendant shall submit to up to 72 tests per year as approved by Probation). Finally, the Defendant will be required to pay a $100 special assessment.

IT IS SO ORDERED.

---

the mix in applying the Guidelines on an advisory basis. Furthermore, while Congress passed legislation disapproving the Sentencing Commission's 1995 proposed amendment adopting a 1:1 equivalence between crack and cocaine, Congress has taken no action with respect to the Commission's 2002 report which effectively recommends a 20:1 ratio.

34. A base offense level of 26 plus 2 points for proximity to a school equals a total offense level of 28. Offense level 28 with Criminal History Category III yields a range of 97 to 121 months.

35. Base offense level of 26 plus 2 points (proximity to school equals 28; criminal history category of III).