BYE, Circuit Judge,
with whom LAY, Circuit Judge, joins, concurring in part and dissenting in part.
I agree Spears’s judgment of conviction should be affirmed. Because I would also affirm the sentence he received, I respectfully dissent from the part of the Court’s opinion which reverses the sentence and remands to the district court for resen-tencing based upon a mandatory use of the 100:1 ratio between crack and powder cocaine in the United States Sentencing Guidelines. I fail to see how legislative policy within an advisory system, see United States v. Booker, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (holding the federal guidelines system must be advisory to preserve its constitutionality), can be binding.
I
The 100:1 ratio adopted by Congress manifests itself in two different ways for federal sentencing purposes, only one of which is at issue here. The congressional fiat which district courts clearly may not disregard is the extent to which the 100:1 ratio drives the statutory sentencing levels for drug offenses under 21 U.S.C. § 841(b). Here, one of those statutory sentencing levels required the district court to impose a mandatory minimum sentence of twenty years because Spears’s offense involved fifty grams or more of crack cocaine and he had a prior felony drug offense. See 21 U.S.C. § 841(b)(1)(A).[8] Importantly, to the extent the legislative policy manifested itself directly in statute, the district court abided by the policy and imposed a statutory mandatory minimum sentence of 240 months.
The second way in which the 100:1 ratio manifests itself in federal sentencing is in the base offense levels set forth in United States Sentencing Guideline (U.S.S.G.) § 2D 1.1 for drug offenses. Under § 2D 1.1, a powder cocaine offender must be responsible for 100 times more cocaine than a crack cocaine offender to trigger *1179 the same base offense level. See U.S.S.G. § 2Dl.l(c) (Drug Quantity Table). It is this manifestation of legislative policy which is at issue here.
Parts of this second manifestation of the 100:1 policy remain binding on district courts after Booker. First, district courts must correctly calculate an offender’s advisory guideline range before taking the § 3553(a) factors into account. See United States v. Ruiz, 446 F.3d 762, 773 (8th Cir.2006) (“Post-Booker, the calculation of the advisory Guidelines range represents the ‘critical starting point.’ ”) (quoting United States v. Thomas, 422 F.3d 665, 669 (8th Cir.2005)). Thus, to the extent the policy of adopting a 100:1 ratio plays a factor in correctly calculating the advisory guideline range, district courts must still yield to congressional will. Importantly, the district court heeded this legislative policy when it correctly calculated the advisory guideline range of 324-405 months.
Second, district courts must still consider the advisory guideline range as one of several factors Congress statutorily mandates be considered when imposing a particular sentence. See 18 U.S.C. § 3353(a)(4) (“The court, in determining the particular sentence to be imposed, shall consider ... the sentencing range ... as set forth in the guidelines])]”). Importantly, the district court heeded that congressional mandate when it considered the advisory guideline range of 324-405 months before sentencing Spears.
After Booker, however, Congress may not mandate[9] a district court impose a sentence within a particular guideline sentencing range, because such a practice runs afoul of the Sixth Amendment. Booker, 543 U.S. at 233, 125 S.Ct. 738. Under the current system (which Congress has chosen not to change following Booker), Congress can only advise district courts on the imposition of a particular sentence within a particular range. Thus, if we start from the premise the guidelines’ system is advisory, which we must, any advice given within such a system cannot be binding by its very nature, no matter whether the advice is on matters of broad policy or otherwise.
It is therefore inconsistent with Booker to hold district courts must follow congressional advice, or policy, when it is given within the context of an advisory system. In my view, this is the fundamental flaw in the reasoning of our sister circuits which have prohibited district courts from considering, under 18 U.S.C. § 3553(a), a different ratio than the 100:1 ratio used in the guidelines. While Booker clearly does not give district courts license to ignore congressional advice or policy by deciding, for example, the base offense level for second degree murder should be thirty rather than thirty-eight, or the crack/powder cocaine ratio should be 5:1 rather than 100:1, the limitation now imposed upon district courts is reason. Booker, 543 U.S. at 261, 125 S.Ct. 738. Post-Booker, unreasonable or arbitrary departures from the advisory guidelines are still prohibited. But so long as a district court has a reasoned basis for declining to follow Congressional advice after considering it, the district court should be upheld. As explained below in Section III, the district court had a reasonable basis for concluding the 20:1 ratio was appropriate to achieve a sentence that was “sufficient, but not greater than necessary.” 18 U.S.C. § 3553(a).
*1180 My view of this matter is consistent with the view expressed by the Third Circuit in United States v. Gunter, 462 F.3d 237 (3d Cir.2006). Our circuit, like the Third Circuit, requires the district courts to follow a three-step sentencing process in the post-Booker world: to correctly calculate the initial advisory guideline sentence; to determine any upward or downward departures within the advisory guidelines; and, finally, to consider any relevant § 3553(a) factors in determining whether a reasonable variance from the resulting advisory guideline range should be imposed. Compare Gunter, 462 F.3d at 247 (discussing this three-step sentencing process), with United States v. Shannon, 414 F.3d 921, 923-24 (8th Cir.2005) (discussing the same three-step sentencing process). The Third Circuit indicated that, while a district court was precluded from categorically rejecting the 100:1 ratio in step one of the sentencing process, see Gunter, 462 F.3d at 249, it is entirely appropriate for a district court to consider a different ratio under step three of the sentencing process, see id. at 248 (“[Tjhere is nothing special about the crack cocaine Sentencing Guidelines that makes them different, or less advisory, than any other Guidelines provision.”). In this case, the district court did not categorically reject the 100:1 ratio under step one; it appropriately considered a different ratio under step three with reference to the § 3553(a) factors.[10]
II
I do not believe all broad, categorical, legislative policy decisions are already taken into account in the calculation of the advisory guideline range, such that when it comes time for a district court to consider the § 3553(a) factors, the only factor left for consideration in departing from the advisory guideline range is the individual circumstances of a given case. See, e.g., United States v. Pho, 433 F.3d 53, 62 (1st Cir.2006) (“The clear import of this statutory framework is to preserve Congress’s authority over sentencing policy and to guarantee that the exercise of judicial discretion over sentencing decisions be based on case-specific circumstances, not on general, across-the-board policy considerations.”). The statutory construct of § 3553(a) clearly does not support such a conclusion.
Section 3553(a) lists several factors district courts must consider when sentencing a particular defendant, three of which I emphasize to illustrate why the statute not only allows, but requires, district courts to consider more than the individual circumstances of a given case when sentencing a given defendant.
First, § 3553(a)(1) explicitly requires district courts to consider “the nature and circumstance of the offense and the history and characteristics of the defendant.” This factor requires district courts to consider the case-specific circumstances of a given defendant and a given offense. In contrast, section 3553(a)(2)(A) broadly requires district courts to consider sentences that “reflect the seriousness of the offense, ... promote respect for the law, and ... *1181 provide just punishment for the offense.” The broad mandate in § 3353(a)(2)(A) cannot be read as limiting district courts to consideration of case-specific circumstances, because such a reading would render the case-specific instructions of § 3553(a)(1) redundant. Statutes cannot be construed so as to render one part inoperative. See United States v. Alaska, 521 U.S. 1, 59, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997) (“The Court will avoid an interpretation of a statute that ‘renders some words altogether redundant.’ ”) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)).
Similarly, § 3553(a)(2)(A)’s directive to consider the seriousness of the offense cannot be interpreted to mean merely the seriousness of the offense as already taken into account in the calculation of the guidelines range, because such an interpretation would be redundant to the directive in § 3553(a)(4) to consider “the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines!)]” Thus, if § 3553(a)(2)(A) is to be given any independent meaning, which it must, it requires district courts to evaluate the seriousness of, and just punishment for, an offense separate and apart from evaluating the case-specific circumstances of a given offense and a given defendant under § 3553(a)(1), or the guideline range under § 3553(a)(4). A district court must consider its own evaluation of the seriousness of a given type of offense. Such an evaluation is the essence of judging, not legislating. Here, the district court did its job by judging, not legislating; pursuant to § 3553(a)(2)(A) the district court gave reasoned consideration to the Sentencing Commission’s own reasoned rejection of the 100:1 ratio.
Will such a practice create sentencing disparity? I do not doubt- it will. When sentencing cocaine offenders, some district courts will choose to follow Congress’s advice by sentencing defendants within the advisory guideline range incorporating the 100:1 ratio. Such a decision is reasonable, or, at a minimum, not inherently unreasonable. See United States v. Cawthorn, 429 F.3d 793, 803 (8th Cir.2005). Other district courts will, however, consider the Sentencing Commission’s recommendation — as well as the empirical data upon which the Commission based its recommendation — and impose a sentence which incorporates a 20:1 ratio.
Will such a practice create unwarranted sentencing disparity? See 18 U.S.C. § 3553(a)(6) (requiring district courts to consider “the need to avoid unwarranted sentence disparities”). Absolutely not. Both when district courts choose to follow congressional advice in adopting a 100:1 ratio and when district courts choose to follow the Sentencing Commission’s recommendation to adopt a 20:1 ratio, the district courts will have reasoned bases for their decisions. Disparate sentences, based on reason, should not be viewed as unwarranted, as we have implicitly recognized. See United States v. Sebastian, 436 F.3d 913, 916 (8th Cir.2006) (discussing the warranted sentencing disparities created by the “fast-track” program for certain immigration offenses).
Indeed, the Supreme Court predicted the reasonableness standard would necessarily create some lack of uniformity in the sentences imposed by district courts, but clearly implied the dissimilitude was a necessary evil of maintaining a constitutional sentencing regime:
Regardless, in this context, we must view fears of a “discordant symphony,” “excessive disparities,” and “havoc” (if they are not themselves “gross exagger *1182 ations”) with a comparative eye. We cannot and do not claim that use of a “reasonableness” standard will provide the uniformity [in sentencing] that Congress originally sought to secure.
Booker, 543 U.S. at 263, 125 S.Ct. 738.
The Supreme Court prefaced its comments on uniformity by remarking “[t]he Sentencing Commission will continue to collect and study appellate court decision-making. It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices. It will thereby promote uniformity in the sentencing process.” Id. Ironically, the Sentencing Commission did precisely that in its 2002 report when it recommended a 20:1 ratio, because the 100:1 ratio was creating unwarranted sentencing disparities among cocaine offenders. • Yet our Court now forbids district courts from considering the Commission’s recommendation. I submit such an approach is misguided. Some disparity will inevitably occur during the transition from the old mandatory system to the new advisory system. By forbidding district courts from considering the Sentencing Commission’s report, we perpetuate the unwarranted sentencing disparities the Commission identified between crack and powder cocaine offenders — in violation of 18 U.S.C. § 3553(a)(6) — at the expense of warranted disparities caused by the adoption of a constitutional, advisory guideline system.
Ill
I believe the district court had a well-reasoned basis for concluding the use of the 20:1 ratio was appropriate to achieve a sentence “sufficient, but not greater than necessary.” 18 U.S.C. § 3553(a). The district court adopted as its own the decision in United States v. Perry, 389 F.Supp.2d 278 (D.R.I.2005), which in turn contains a well-reasoned discussion and summary of the Sentencing Commission’s May 2002 Report to Congress on “Cocaine and Federal Sentencing Policy” (hereinafter 2002 Report). I believe a thorough discussion of the findings and conclusions contained in the 2002 Report is necessary to fully understand the reasonableness of the district court’s decision. I therefore turn my focus directly to the 2002 Report itself.
The Commission began its comprehensive 112-page report with an introductory section which attempts to explain Congress’s reasons for adopting the 100:1 ratio. At the outset, the Commission noted “Congress bypassed much of its usual deliberative process” when it passed the Anti-Drug Abuse Act of 1986 “[bjecause of the heightened concern and national sense of urgency surrounding drugs generally and crack cocaine specifically[.]” 2002 Report at 5. “As a result, there were no committee hearings and no Senate or House Reports accompanying the bill that ultimately passed.... Thus, the legislative history for the bill that was enacted into law is limited primarily to statements made by senators and representatives during floor debates.” Id. at 5-6.
The Commission next examined the legislators’ statements in an attempt to identify their intent in adopting the 100:1 ratio, prefaced with the comment “there is no authoritative legislative history that explains Congress’s rationale for selecting the 100-to-l drug quantity ratio for powder cocaine and crack cocaine offenses.” Id. at 7. Nonetheless, the Commission was able to identify from the limited legislative history “five important beliefs” to “suggest that Congress concluded that crack cocaine was more dangerous than powder cocaine and therefore warranted higher penalties[.]” Id. at 9. The five beliefs were:
*1183 • Crack cocaine was extremely addictive. The addictive nature of crack cocaine was stressed not only in comparison to powder cocaine, but also in absolute terms.
• The correlation between crack cocaine use and distribution and the commission of other serious and violent crimes was greater than that with other drugs. Floor statements focused on psycho-pharmacologically driven, economically compulsive, as well as systemic crime (although members did not typically use these terms).
• Physiological effects of crack cocaine were considered especially perilous, resulting in death to some users and causing devastating effects on children prenatally exposed to the drug.
• Young people were particularly prone to using and/or being involved in trafficking crack cocaine.
• Crack cocaine’s purity and potency, low cost per dose, and the ease with which it was manufactured, transported, disposed or, and administered, were all leading to its widespread use.
Id. at 9-10.
The Commission then systematically exposed each of these “five important beliefs” as unsupported by its research and its study of actual federal drug sentences.
A
1. Crack Cocaine is Not Extremely Addictive when Compared to Powder Cocaine.
Of the five beliefs upon which Congress based the 100:1 ratio, the belief that crack is extremely addictive when compared to powder cocaine is at least partially true. While crack cocaine is not extremely more addictive when compared to powder cocaine, crack’s manner of ingestion — smoking vs. snorting — indicates it may be slightly more addictive than powder cocaine.
The Commission found “[c]ocaine in any form is potentially addictive.” Id. at 18 (citing National Institute of Health (NIH), NIDA Research Report Series, Cocaine Abuse and Addiction, Pub. No. 99-4342 (May 1999); Karen Bolla et al., The Neuropsychiatry of Chronic Cocaine Abuse, 10 Journal of Neuropsychiatry and Clinical Neurosciences 280-289 (1998)). Cocaine in “any form ... produces the same types of physiological and psychotropic effects once the drug reaches the brain.” Id. at 17. As a consequence, “[cjrack cocaine and powder cocaine are both powerful stimulants and both forms of cocaine cause identical effects.” Id. at 16 (emphasis added).
Due to the difference in the manner in which crack cocaine is administered into the body, however, “the risk of addiction may be greater for crack cocaine than for powder cocaine.” Id. (emphasis added). “Smoking the drug produces a quicker onset, shorter duration, and more intense effects than snorting powder cocaine.” Id. at 19.
[Although both powder and crack cocaine are potentially addictive, administering the drug in a manner that maximizes the effect (e.g., injecting or smoking) increases the risk of addiction. It is this difference in typical methods of administration, not differences in the inherent properties of the two forms of the drugs, that makes crack cocaine more potentially addictive to typical users.

Id.

In sum, the 2002 Report establishes that the “belief’ crack cocaine is extremely more addictive than other drugs, including powder cocaine, is simply not well-founded. In addition, the Commission’s ultimate recommendation to utilize a 20:1 ratio, rather *1184 than a 100:1 ratio, adequately takes into account the Commission’s conclusion crack cocaine is somewhat more addictive than powder cocaine.
2. The Correlation Between Crack Cocaine Offenses and Other Serious/Violent Crimes is Not Significantly Greater than that with Powder Cocaine Offenses.
The “belief’ that crack cocaine addiction causes people to commit other serious, violent crimes at an alarming rate is well-illustrated by one senator’s statement during floor debates on the 1986 Act:
We find again once people are hooked, all they can think about is staying high, that euphoria which they get, but there is a corresponding down that is just as deep in its trough as the high is at the crest of the wave. And so we find that people, when they are addicted, will go out and steal, rob, lie, cheat, take money from any savings, take refrigerators out of their houses, anything they can get their hands on to maintain that habit. That, of course, has caused crime to go up at a tremendously increased rate in our cities and in our States — the crimes of burglary, robbery, assault, purse snatching, mugging, those crimes where people are trying to feed that habit. Our local police and our sheriffs have found themselves unable to cope with the crime.
Id. at 9 n. 31 (quoting 132 Cong. Rec. 31,329-30 (daily ed. Oct. 15, 1986) (statement of Sen. Chiles)).
To determine whether this “belief’ was warranted, the Commission conducted an extensive examination of data gathered from actual crack cocaine and powder cocaine offenses in the federal system. Id. at 32-62. Part of this examination focused on whether crack cocaine offenders actually commit other serious or violent crimes significantly more often than do powder cocaine offenders. Again, the Commission’s examination of the actual data established this belief was unsupported. In fact, there is only a slight difference between powder and crack cocaine offenses vis a vis the involvement of other serious or violent crimes.
The Commission examined the following “aggravating factors” that often accompany drug offenses: weapon involvement, bodily injury, co-participants under eighteen, sales to minors, sales to pregnant women, and sales in a protected location. Id. at 52-58. From this examination, the Commission concluded “[t]he majority of powder cocaine and crack cocaine offenses did not involve aggravating conduct considered by many to be most egregious (e.g., weapon involvement, bodily injury resulting from violence, and distribution to protected persons or in protected locations).” Id. at 32. The Commission also found “[t]he proportion of cases involving aggravated conduct generally has declined for both powder cocaine and crack cocaine offenses since 1995.” Id.
For example, in 2000, using a very broad definition of “weapon involvement” that included everything from actual use of the weapon by the offender to a weapon merely being accessible by an unindicted co-conspirator, the Commission found weapons were involved in 25.4% of powder cocaine offenses and 35.2% of crack cocaine offenses. Id. at 53.
With respect to bodily injury or death resulting from violence rather than drug use, the Commission found deaths occurred at the same rate for both forms of the drug (3.4%), and bodily injury occurred in just 4.5% of crack cocaine offenses and just 1.4% of powder cocaine offenses. There were actually slightly more threats of bodily harm involved in powder cocaine offenses (4.2%) than crack cocaine offenses *1185 (3.7%). Finally, with all three types of “bodily injury” considered (everything from mere threats to death), the vast majority of both forms of cocaine offenses involved no bodily injury (91.0% of powder cocaine offenses and 88.4% of crack cocaine offenses). Id. at 57.
With respect to the involvement of co-participants under eighteen years of age, the Commission found it was “rare in both powder cocaine and crack cocaine offenses,” occurring in just 1.8% of powder cocaine offenses and 4.2% of crack cocaine offenses. Id. Sales to minors were even more rare, occurring in just 0.8% of powder cocaine offenses, and even less in crack cocaine offenses, 0.5%. Id. at 58. Sales to pregnant women were non-existent in crack cocaine offenses, and occurred in just 0.4% of powder cocaine offenses; sales in a protected location were also rare, occurring in just 0.9% of powder cocaine offenses and 4.5% of crack cocaine offenses. Id.
In sum, the Commission’s findings indicate there is only a marginal difference between crack cocaine and powder cocaine with respect to either’s relation to other serious and violent crimes (with powder cocaine exceeding crack cocaine in some categories), and in the case of both forms of the drug the aggravating factors deemed to be the most egregious “still occurred in only a minority of the cases.” Id. at 32.
3. Crack Cocaine Does Not Have Devastating Effects on Children Prenatally Exposed to the Drug.
Treating crack cocaine 100 times more severe than powder cocaine cannot be supported by the mistaken belief crack cocaine has a devastating effect on children prenatally exposed to the drug. That is a myth. In fact, the Commission’s review of the research indicated “[t]he negative effects of prenatal exposure to crack cocaine are identical to the effects of prenatal exposure to powder cocaine.” Id. at 21 (emphasis added).
In addition, the research indicated “[t]he negative effects of prenatal cocaine [in either form] exposure are significantly less severe than previously believed.” Id. Dr. Deborah Frank, one of the authors of Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review, 285 Journal of American Medical Association 1613 (March 28, 2001), provided a written statement to the Commission reporting the effects of prenatal exposure to cocaine are “very similar to those associated with prenatal tobacco exposure.” 2002 Report at 22 (quoting written statement Deborah A. Frank, M.D., to the U.S. Sentencing Commission, regarding Drug Penalties (Feb. 25, 2002) at 1).
The Commission also considered research conducted by Gale A. Richardson and reported at Prenatal Cocaine Exposure: A Longitudinal Study of Development, 846 Annals of the New York Academy of Sciences 144 (1998). While that study confirmed prenatal cocaine exposure caused children to have shorter attention spans, and to be less focused and more restless, it also concluded prenatal alcohol and marijuana use had the same effect on children. 2002 Report at 28 (citing Richardson’s research). From this and other extensive research[11] reviewed by the Com *1186 mission, the Commission concluded “[r]e-cent research on prenatal exposure to cocaine generally indicates that the long-term negative effects of prenatal cocaine exposure do not differ from the long-term negative effects of prenatal exposure to other substances, both legal and illegal.” Id. at 27 (emphasis added).
In sum, the 2002 Report indicates there is no reasoned basis for treating crack cocaine more severely for sentencing purpose than powder cocaine based on the harmful effects of crack to prenatal children, because the prenatal effects of powder cocaine and crack cocaine are identical. Moreover, the 2002 Report indicates Congress’s concern about the “devastating” effects of prenatal exposure to cocaine, in any form, is largely unfounded, because the harmful effects of cocaine do not differ from the harmful effects of other substances, such as tobacco, alcohol, and marijuana.
4. Young People are Not Particularly Prone to Using and/or Being Involved in Trafficking Crack Cocaine.
The 2002 Report also dispels the belief that young people are particularly prone to using crack and trafficking in crack. For example, the Commission found:
Cocaine use historically has been relatively rare among high school seniors. Powder cocaine use peaked in 1985, when 6.7 percent of high school seniors reported use, and decreased to its lowest point (1.3%) in 1992. Crack cocaine use (on which data is available only from *1187 1987) peaked in 1998, when 1.6 percent of high school seniors reported use, and decreased to its lowest level, also in 1992, at 0.6 percent.
Data from the NHSDA [National Household Survey on Drug Abuse] suggest that crack cocaine use among 18- to 25-year old adults is even more rare than among high school seniors, and has shown a similar plateau in recent years. Between 1994 and 1998, on average less than 0.4 percent of those young adults reported using crack cocaine within the last 30 days, and in 1998 powder cocaine was used by seven times as many young adults as crack.
Id. at 70 & n. 147 (emphasis added).
The Commission’s data, which tracked reported drug use among high school seniors from 1975 through 2000, indicated marijuana is by far the drug of choice among young users. See id. at 71, Fig. 24. For example, in 1987, 24.7% of high school seniors reported using some form of illicit drug, with 21% indicating use of marijuana, compared with 4.1% reporting use of powder cocaine and just 1.3% reporting use of crack cocaine. In 1999, of the 25.9% reporting use of some form of illicit drug, 23.1 % reported marijuana, 2.5% reported powder cocaine, and just 1.1 % reported use of crack cocaine. Id. Each year between 1975 and 2000 follows a similar pattern, with marijuana use comprising the lion’s share of overall reported use, while reported crack cocaine use remained under or near just 1%. See id.
In addition, as noted above, the Commission identified the number of crack cocaine offenses which involved co-participants under the age of eighteen, concluding it was “rare” and occurred in just 4.2% of those offenses. Id. at 57. Crack cocaine offenses involving sales to minors are rarer yet, occurring just 0.5% of the time, even less than powder cocaine offenses where there is a sale to a minor 0.8% of the time. Id. at 58.
In sum, there is no evidence to suggest young people are particularly prone to using or trafficking in crack. In fact, the evidence indicates just the opposite — when the use of crack is compared to the use of powder cocaine, the evidence suggests powder cocaine use is more prevalent among young people than crack cocaine.
5. Crack Cocaine’s Purity, Potency, Low Cost Per Dose, Ease of Manufacture, etc., are Not Leading to its Widespread Use.
Finally, the Commission’s report generally indicates crack cocaine use is not nearly as widespread as the use of powder cocaine. Figure 23 shows the estimated number of adults from 1979 through 1998 who report cocaine use, with estimates of the number of crack cocaine users available after 1987. Id. at 69. In every year from 1988 through 1998, the number of estimated crack users has remained relatively flat and has never exceeded 686,000. During that period of time, there have been anywhere from 2.5 to 4.5 times as many powder cocaine users as crack cocaine users. For example, in 1988 the NHSDA estimated there were 3.14 million powder cocaine users in the United States and only 673,000 crack cocaine users; in 1998 there were an estimated 1.75 million powder cocaine users and only 437,000 estimated crack cocaine users. Id.
In sum, there is no reasonable basis to suggest crack cocaine needs to be treated more severely than powder cocaine out of concern of a widespread crack epidemic. If anything, the evidence suggests powder cocaine should be targeted more severely than crack.
B
The 2002 Report concludes with the Commission’s findings and recommenda *1188 tions. As a result of its analysis, the Commission determined the 100:1 ratio was unjustified:
After carefully considering all of the information currently available — some 16 years after the 100-to-l quantity ratio was enacted — the Commission firmly and unanimously believes that the current federal cocaine sentencing policy is unjustified and fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act. The 100-to-l drug quantity was established based on a number of beliefs about the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support.
Id. at 91.
The Commission listed four specific findings regarding the ratio that merit mention. They are: 1) Current Penalties Exaggerate the Relative Harmfulness of Crack Cocaine; 2) Current Penalties Sweep Too Broadly and Apply Most Often to Lower Level Offenders; 3) Current Penalties Overstate the Seriousness of Most Crack Cocaine Offenses and Fail to Provide Adequate Proportionality; and 4) Current Penalties’ Severity Mostly Impacts Minorities. Id. at 93-103. I will highlight a few of the Commission’s comments that have not already been discussed above.
1. Current Penalties Exaggerate the Relative Harmfulness of Crack Cocaine.
The current 100:1 ratio exaggerates the relative harmfulness of crack cocaine for all the reasons discussed above which show there is very little difference between the dangers of powder cocaine and crack cocaine. In addition, the Commission engaged in a discussion of the comparative doses that can be obtained from the same amount of each type of the drug — an apples to apples comparison, if you will — to illustrate how current penalties even further exaggerate the relative harmfulness of crack cocaine because the same amount of cocaine will typically yield fewer doses of crack than powder:
With respect to doses, one gram of powder cocaine[12] generally yields five to ten doses, whereas one gram of crack cocaine yields two to ten doses. Thus, 500 grams of powder cocaine — the quantity necessary to trigger the five-year mandatory minimum penalty — yields between 2,500 and 5,000 doses. In contrast, five grams of crack cocaine — the quantity necessary to trigger the five-year statutory minimum penalty — yields between ten and fifty doses.
Id. at 17.
For comparison purposes, then, a crack dealer who supplies a single user with a single dose of crack for just ten days would be subject to a five-year mandatory minimum sentence, while a powder cocaine dealer could supply seven users for an entire year before being subject to the same sentence. As the Commission found, such an approach “greatly overstates the relative harmfulness of crack cocaine.” Id. at 93.
2. Current Penalties Sweep Too Broadly and Apply Most Often to Lower Level Offenders.
As the Commission noted, “the mandatory minimum penalty structure established *1189 by the 1986 Act generally was designed to target ‘serious’ and ‘major’ drug traffickers for federal prosecution.” Id. at 99. Congress intended to target “serious traffickers,” defined as “the managers of the retail traffic,” with five-year mandatory minimum sentences, and “major traffickers,” defined as “manufacturers or the heads of organizations who are responsible for creating and delivering very large quantities” with ten-year mandatory minimum sentences. Id. In other words, the higher up the distribution chain the drug trafficker operated, the more severe the penalties would be. Furthermore, Congress desired to focus federal resources on those higher up the distribution chain as a means of preserving “scarce federal law enforcement resources,” leaving the states to prosecute the lower-level dealers. Id.
The Commission determined Congress’s intent to focus on the big fish, so to speak, is frustrated by the 100:1 ratio because the big fish deal in powder cocaine, not crack. “[Cjrack cocaine is trafficked principally at the retail level and is usually converted from powder cocaine near the point of retail sale.” Id. at 66. As a consequence, “[i]n 2000, the majority of federal crack cocaine offenders — two thirds — were street-level dealers.” Id. “[0]nly 5.9 per cent of federal crack cocaine offenders performed trafficking functions (manager, supervisor) that are most consistent with the functions described in the Subcommittee report as warranting a five-year penalty.” Id. “And only 15.2 percent performed trafficking functions (importer, high-level supplier, organizer, leader, wholesaler) that are most consistent with the functions described as warranting a ten-year penalty.” Id.
Use of the 100:1 ratio results, then, in scarce federal resources being spent on the little fish rather than the big fish. In addition, the little fish dealing in crack cocaine at the street level are receiving much more severe sentences than the big fish dealing in powder cocaine higher up the distribution chain:
In sum, instead of targeting serious and major traffickers in a manner similar to the articulated congressional design of penalties for other major drugs of abuse, crack cocaine mandatory minimum penalties currently apply most often to offenders who perform low-level trafficking functions, wield little decision-making authority, and have limited responsibility. Based solely on trafficking functions, the penalties appear to overstate the culpability of most crack cocaine offenders.
Id. at 99-100.
3. Current Penalties Overstate the Seriousness of Most Crack Cocaine Offenses and Fail to Provide Adequate Proportionality.
“An important basis for the establishment of the 100-to-l drug quantity ratio was the belief that crack cocaine trafficking was highly associated with violence generally.” Id. at 100. As discussed above, however, this belief cannot be supported by the actual data studied by the Commission. The Commission identified two principal concerns raised by continuing to utilize the 100:1 ratio based upon this unsupported belief:
First, to the extent that the 100-to-l drug ratio was designed to account for the harmful conduct examined in this section, it sweeps too broadly by treating all crack cocaine offenders as if they committed these various harmful acts, even though most crack cocaine offenders in fact had not. In other words, the offense seriousness of most crack cocaine offenders is overstated by the 100-to-l drug quantity ratio, suggesting that a differential this extreme is unjust. *1190 A second, related proportionately problem is that the current penalty structure provides no sentencing differential between crack cocaine offenders who do in fact commit those harmful acts and those who do not. Because the current penalty structure assumingly accounts for those harmful acts in the quantity-based penalties, there are not specific sentencing enhancements in the primary drug trafficking guideline more appropriately targeting those offenders who actually commit those acts for especially severe penalties (with the exception of a two-level sentencing enhancement for possession of a dangerous weapon). As a result, the current penalty structure fails to provide adequate sentencing proportionality. In other words, the current penalty structure results in inappropriate sentencing uniformity for the most serious offenders.
Id. at 100-01.
The Commission indicated this unwarranted sentencing disparity could be avoided by “(1) providing specific sentencing enhancements targeted at the more culpable traffickers of crack cocaine or other drugs who commit those harmful acts, and (2) decreasing the quantity-based penalties for crack cocaine to correct for the overstatement of the offense seriousness and culpability of the majority of offenders who do not commit such acts.” Id. at 101.
4. Current Penalties’ Severity Mostly Impacts Minorities.
Finally, the Commission focused on the discriminatory impact the 100:1 ratio has on blacks. “The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.” Id. at 102-03. “Perceived improper racial disparity fosters disrespect for the law and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.” Id.
District courts are required to consider a sentence that will promote “respect for the law.” 18 U.S.C. § 3353(a)(2)(A). District courts are further required to consider “the need to avoid unwarranted sentencing disparities.... ” Id. at § 3353(a)(6). Sentencing black offenders more severely . than similarly-situated white offenders, with no reasoned basis for doing so, promotes disrespect for the law and the system rather than respect, and creates unwarranted and discriminatory sentencing disparities.
C
As a result of its findings, the Commission made several recommendations to Congress to change the current sentencing structure. Among those recommendations was the one at issue here, the recommendation “that a drug-quantity ratio of not more than 20-to-l ... would appropriately reflect those harms that cannot be fully addressed by specific sentencing enhancements.” Id. at 107.
Thus, the district court did not arbitrarily choose a 20:1 ratio. The district court’s choice was based on a reasoned and detailed report which discussed the original premises upon which the 100:1 ratio was based, discussed at length why those original premises were unsupportable, and analyzed the unwarranted sentencing disparities created by the 100:1 ratio. I find everything in the 2002 Report to be eminently reasonable, and consequently, believe the district court was reasonable in relying upon it.
*1191 rv
While district courts must consider congressional advice when sentencing a particular defendant, they should not be required to abide by it when it is given within the context of an advisory system. I cannot square such an approach with the constitutional infirmities of a mandatory sentencing regime identified by the Supreme Court in Booker. I would therefore affirm not only Steven Spears’s judgment of conviction, but also the reasonable sentence imposed by the district court.

. Congress does not require the same mandatory minimum sentence for a powder cocaine offender unless five kilograms of cocaine are involved, or 100 times the amount of crack cocaine. See id.

. Prior to Booker, the congressional mandate to sentence within the guideline range was subject, of course, to certain exceptions for departures. But the departures had to be justified within the limits allowed by the guidelines, and thus, in that sense, were still mandated by Congress.

. While the district court reserved ruling on other § 3553(a) factors, it does not follow that the district court failed to perform a § 3553(a) analysis, as the majority contends. The district court based its decision on the rationale of United States v. Perry, 389 F.Supp.2d 278 (D.R.I.2005), which clearly analyzed this issue under step three of the sentencing process (consideration of § 3553(a) factors), not step one (calculation of the advisory guideline range). See Perry, 389 F.Supp.2d at 301 (“Now sentencing courts must consider this disparity in the context of the § 3553 factors and must also vary from the Guideline range if the Guideline sentence is not consonant with the purposes of § 3553 ”).

. The other research and studies considered by the Commission include: Vincent L. Smeriglio & Holly C. Wilcox, Prenatal Drug Exposure and Child Outcome: Past, Present, Future, 26 Clinics in Perinatology 1 (March 1999); Robert Arendt, et al., Sensorimotor Development in Cocaine-exposed Infants, 21 Infant Behavior & Development 627 (1998); Marylou Behnke et al., Incidence and description of structural brain abnormalities in newborns ex *1186 posed to cocaine, 132 Journal of Pediatrics 291 (Feb. 1998); Virginia Delaney-Black, et al., Teacher-Assessed Behavior of Children Prenatally Exposed to Cocaine, 106 Pediatrics 782 (Oct.2000); David A. Bateman et al., The Effects of Intrauterine Cocaine Exposure in Newborns, 83 American Journal of Public Health 190 (Feb. 1993); Gale A. Richardson, et al., Growth of Infants Prenatally Exposed to Cocaine/Crack: Comparison of a Prenatal Care and a No Prenatal Care Sample, 104 Pediatrics (Aug. 1999); Robert Arendt, et al., Motor Development of Cocaine-exposed Children at Age Two Years, 103 Pediatrics 86 (Jan.1999); Virginia Delaney-Black, et al., Prenatal Cocaine and Neonatal Outcome: Evaluation of Dose-Response Relationship, 98 Pediatrics 735 (Oct. 1996); Fonda Davis Eyler, et al., Birth Outcome From a Perspective, Matched Study of Prenatal Crack/Cocaine Use: I. Interactive and Dose Effects on Health and Growth, 101 Pediatrics 229 (Feb. 1998); Fonda Davis Eyler, et al., Birth Outcome From a Perspective, Matched Study of Prenatal Crack/Cocaine Use: II. Interactive and Dose Effects on Neurobeha-vioral Assessment, 101 Pediatrics 237 (Feb. 1998); Lynn T. Singer, et al., Cognitive and Motor Outcomes of Cocaine-Exposed Infants, 287 JAMA 1952 (Apr. 17, 2002 reprint); Hal-lam Hurt, et al., Children with In Utero Cocaine Exposure Do Not Differ from Control Subjects on Intelligence Testing, 151 Archives on Pediatrics & Adolescent Medicine 1237 (Dec. 1997); Ira J. Chasnoff, et al., Prenatal Exposure to Cocaine and Other Drugs: Outcome at Four to Six Years, 846 Annals of the New York Academy of Sciences 314 (1998); D. Rush & K.R. Callahan, Exposure to Passive Cigarette Smoking and Child Development: A Critical Review, 562 Annals of the New York Academy of Science 74 (1989); Ann P. Stre-issguth, et al., Neurobehavioral Dose-Response Effects of Prenatal Alcohol Exposure in Humans from Infancy to Adulthood, 562 Annals of the New York Academy of Science 145 (1989); Peter A. Fried, Behavioral Outcomes in Preschool and School-Age Children Exposed Prenatally to Marijuana: A Review and Speculative Interpretation, 164 NIDA Research Monograph 242 (1996); Fried et al., Differential Effects on Cognitive Functioning in 9- to 12-Year Olds Prenatally Exposed to Cigarettes and Marihuana, 20 Neurotoxicology and Teratolo-gy 293 (1998); N.L. Day, et al., Effect of Prenatal Marijuana Exposure on the Cognitive Development of Offspring at Age Three, 16 Neurotoxicology and Teratology 169 (Mar./ Apr. 1994); Karol A. Kaltenbach, Exposures to Opiates: Behavioral Outcomes in Preschool and School-Age Children, 164 NIDA Research Monograph 230 (1996); Mark A. Plesinger, Prenatal Exposure to Amphetamines: Risks and Adverse Outcomes in Pregnancy, 25 Obstetrics & Gynecology Clinics of North America 119 (March 1998).

. "One gram of pure powder cocaine under ideal conditions will convert to approximately 0.89 grams of crack cocaine.” Id. at 16.